KENTUCKY UTILITIES COMPANY,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Jackson Purchase Electric Cooperative
Corp., Cities of Barbourville, et
al., Intervenors.

No. 81–2027.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 29, 1982.

Decided Sept. 7, 1982.

Leonard W. Belter, with whom William A. Kehoe, III, Washington, D. C., and Malcolm Y. Marshall, Louisville, Ky., were on the brief for petitioner.

Joel Cockrell, Washington, D. C., for respondent.

Thajuana D. Miller and Jerome M. Feit, Washington, D. C., entered appearances for respondent.

Dandridge F. Walton, Frankfort, Ky., entered an appearance for intervenor, Jackson Purchase Elec. Co-op. Corp.

Sandra J. Strebel, Frances E. Francis, Daniel Guttman and Patricia E. Stack, Washington, D. C., entered appearances for intervenor Cities of Barbourville, et al.

Barbara J. Weller and Charles A. Moore, Washington, D. C., entered appearances for F. E. R. C.

Before WILKEY and WALD, Circuit Judges and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

In this appeal, Kentucky Utilities Company ("KU" or "Company") challenges an order of the Federal Energy Regulatory Commission ("FERC" or "Commission") suspending implementation of a rate increase until five months and 21 days after the Company proposed that the new rate take effect. The Company argues first that FERC had no authority to delay the effective date for a period longer than five months, and, second, that FERC failed to state adequately its reasons for imposing even the maximum allowable suspension of five months. We find, however, that the Commission properly calculated the five-month suspension period from 60 days after the rate filing was brought into compliance with the applicable regulations. Further, we hold that the Commission adequately stated its reasons for imposing the maximum suspension period.

## I. BACKGROUND

In accordance with the requirement of the Federal Power Act that a utility give at least sixty days notice to the Commission and public of an increase in wholesale rates, 16 U.S.C. § 824d(d), KU submitted to FERC on March 17, 1981,[1] "revised provisions for electric service to KU's wholesale for resale customers." Letter from J. W. Bradley to Kenneth Plumb (Mar. 16, 1981), Joint Appendix ("J.A.") at 11. The same Act authorizes the Commission to suspend

the operation of a filed rate for a period not longer than "five months beyond the time when it would otherwise go into effect" upon "delivering to the public utility affected thereby a statement in writing of its reasons for such suspension." 16 U.S.C. § 824d(e). Citing its "dire financial straits," KU requested a June 1 effective date for its new rate and urged a nominal suspension of one day.

The Company proposed rate WPS–81 for its full requirements customers, the majority (26) of which were then subject to rate WPS–78. Fourteen of its full requirements customers, however, were charged under a separate 1967 contract. The Company proposed a different rate for its only other wholesale customer, the City of Paris, Kentucky, which was charged in accordance with a partial requirements agreement.[2] Letter from J. W. Bradley to Kenneth Plumb, List A (Mar. 16, 1981), J.A. at 14. Although WPS–81 was not intended to apply to the City of Paris, it applied to the remainder of KU's wholesale customers, including the parties to the 1967 full requirements contract, since the Company had notified them that their agreement would terminate May 31, 1981. The Company had previously submitted a rate increase which would bring these customers under WPS–78 effective June 1. This was the same day as the Company now proposed that its new rate WPS–81 would take effect.

FERC publicly acknowledged receipt of the WPS–81 submissions in a "Notice of Filing" dated March 23, 1981, advising parties who wished to protest the proposed rate to file their petitions by April 13. J.A. at 229. On April 7, however, FERC notified the Company that its filing was "deficient." Letter from Office of the Secretary to J. W. Bradley (undated), J.A. at 230. Specifically, FERC asked the Company to provide (1) data comparing revenues under the expir-

---

1. All dates refer to 1981 unless otherwise indicated.

2. Full requirements customers pay both a "demand charge" and an "energy charge." The "demand charge" is "designed to account for fixed or capacity-related cost plus a return on

the rate base" and the "energy charge [is] designed to account for the variable costs (*e.g.,* fuel) of supplying service." *City of Batavia v. FERC,* 672 F.2d 64, 80 (D.C.Cir.1982). The City of Paris, which has generating facilities of its own, is subject only to an "energy charge."

ing full requirements contract rate with projected revenues under WPS–81; (2) a copy of the recently revised agreement between the Company and the City of Paris; and (3) a more detailed explanation of the operation of the fuel adjustment clause.[3] Pending receipt of the requested information, a filing date would not be assigned to the Company's WPS–81 submissions.

On April 21, the Company responded that it was "happy to provide the information requested but [did] not concede that its filing was deficient with respect to any requirements of the Commission's regulations." Letter from Leonard Belter to Kenneth Plumb (April 21, 1981), J.A. at 255. Although conceding that the revised Paris agreement, which the Company enclosed, was "apparently inadvertently omitted" from the original submission, the Company expressed the view that the "pertinent rate information was contained in [its] filing letter"[4] and that "[t]o the extent that this omission constitute[d] a technical deficiency, it [did] not ... affect the filing with respect to any other customers." The Company maintained that "nothing in the Commission's filing regulations" required the other requested information. Nonetheless, the Company enclosed the requested revenue comparisons between the 1967 full requirements contract and WPS–81, although apparently assuming the adequacy of its initial submission of data comparing WPC–81 revenues with revenues generated under WPS–78. As to the fuel clause information, the Company stated that it had explained to Commission personnel that the original figures were composites and had been advised that further explanation was unnecessary.

The Company asserted, in sum, that its initial submissions were in substantial compliance with the regulations and that the Commission was without authority to delay the filing date. But, as alternatives, the Company asked that the Commission either assign the submissions a filing date no later than April 1 (so that, allowing for 60 days notice, June 1 could remain as the proposed effective date) or that FERC waive its regulations, 18 C.F.R. § 35.13, requiring cost-of-service data from the most recent calendar year, to permit the use of the data submitted (calendar year 1979).

On the basis of the March 17 submissions and the information provided in the letter of April 21, FERC issued an order, FERC Docket Nos. ER81–267–000 & ER81–341–000, (May 29, 1981) [hereinafter *Order*], J.A. at 262, which suspended implementation of the rate "for five months from 60 days after completion of the filing, to become effective on November 21, 1981, subject to refund pending hearing and decision," *id.* at 7, J.A. at 268, thereby ruling that the filing date was April 21, not March 17. On June 24, the Company applied for rehearing, J.A. at 288, arguing again that the March 17 submission as to WPS–81 substantially complied with FERC regulations and additionally questioning the basis for the maximum five months suspension. The Company chose not to contest the delay of the effective date of the Paris contract filing. A month later, FERC "confirmed the propriety of the 'deficiency letter' " and affirmed the five-month suspension. Order on Rehearing, FERC Docket Nos. ER81–341–000 & ER81–267–000, July 24, 1981, at 3–4, J.A. at 303, 305–06. On August 19, the Company filed a petition for reconsideration, J.A. at 308, which was denied by operation of law on September 18. Pursuant to the judicial review provisions of the Federal Power Act,[5] the Company now appeals those orders.

---

**3.** A fuel adjustment clause allows utilities to pass on the increasing cost of fuel to customers without filing a new rate schedule.

**4.** The filing letter stated in pertinent part that "[w]ith respect to the City of Paris, a partial requirements customer, the revised ... agreement increases the currently effective rate from 1.726 cents per KWH to 2.4709 cents per

KWH." Letter from J. W. Bradley to Kenneth F. Plumb at 2 (Mar. 16, 1981), J.A. at 11, 12.

**5.** Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in ... the United States Court of Appeals for the District of Columbia.
16 U.S.C. § 825*l* (b).

## II. ANALYSIS

The thrust of the Company's argument on appeal is (1) that the March 17 submissions were not so deficient as to justify the Commission's temporary rejection of the filing and (2) that the Commission failed to adequately state the reasons for its decision to suspend WPS–81 for five months in accord with our ruling in *Connecticut Light & Power Co. v. FERC*, 627 F.2d 467 (D.C.Cir. 1980). We do not agree.

A. At the outset, the cause for the Company's intense concern over the assigned filing date of April 21 should be noted: the Company claims a loss of $800,000 in revenues due to the 21-day delay in the effective date of the new rate. This considerable loss in revenues, the Company complains, resulted from an initial failure to supply only a few extra sheets of paper to seven volumes of submissions.

The Company summarizes its case that the omissions were insubstantial, as follows:

(1) Rate WPS–81 was never intended to apply to the City of Paris, and, therefore the omission of the Paris contract from the initial filing was irrelevant to a decision on WPS–81. In short, the Commission should have severed consideration of the Paris rate from the WPS–81 proceedings.

(2) Additional information requested by FERC on computations under the fuel adjustment clause could not have been essential since in fact the Company never provided that information and the filing was ultimately deemed complete on April 21 without it.

(3) FERC regulations required only that the Company compare projected revenues under WPS–81 with revenues under WPS–78, which governed the majority of its customers, including, as of June 1, 1981, parties to the 1967 agreement.

The government argues that the Company was put on notice by the April 7 letter that the filing date would be the date on which it cured the three deficiencies, and thus KU should not now be permitted to appeal the determination of deficiency when it failed to appeal the disputed staff action to the Commission within the thirty-day period prescribed by the regulations, 18 C.F.R. § 1.7(d). However, the Company was not notified of the assigned filing and ef-

Our inability to accept this last assertion is sufficient by itself to support an affirmance of the Commission's refusal to accept the initial submission.[6] Section 205(d) of the Federal Power Act requires that "notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the *schedule or schedules then in force* and the time when the change or changes will go into effect." 16 U.S.C. § 824d(d) (emphasis supplied). The Commission's regulations require that a utility file "[a] table or statement comparing sales and services and revenues from sales and services under *the rate schedule to be superceded* or supplemented and under the rate schedule change," 18 C.F.R. § 35.15(c)(1) (emphasis supplied).

FERC reads the Act and its own regulations to require that the Company compare projected revenues under WPS–81 with revenues from the rates established by the 1967 contract which, as to fourteen customers, were the rates in effect at the time WPS–81 was submitted. This is not an unreasonable reading, despite the Company's argument that the WPS–78 rates with which they had compared revenues became effective as to these customers upon expiration of the contract. Had FERC complied with the Company's urgent request for a June 1 effective date for rate WPS–81, *that* rate would have taken effect upon expiration of the contract, and WPS–78 would *never* have taken effect as an intervening rate governing those customers. Consequently, FERC's ruling that the original submission was incomplete is justifiable on this ground alone.

fective dates until issuance of the May 29 Commission order, and only then was it confronted with a decision ripe for challenge.

6. We therefore need not consider the adequacy of the Company's initial submission regarding the fuel adjustment clause or whether the Paris rate was sufficiently related to WPS–81 to justify the Commission's decision not to sever them.

Further, FERC acted within its discretion to delay assignment of a filing date until the requested comparisons were supplied. The Commission's regulations define "filing date" as "the date on which a rate schedule filing is completed by the receipt in the office of the Secretary of all supporting cost and other data required to be filed in compliance with the requirements of this part, unless such rate schedule is rejected as provided in § 35.5." 18 C.F.R. 35.2(c). The referenced provision allows the Commission to "reject any material submitted for filing with the Commission which patently fails to substantially comply with the applicable requirements." 18 C.F.R. § 35.5. FERC "retains broad discretion" to determine the adequacy of a filing to satisfy the objective of affording notice to the Commission and the public. *City of Groton v. FERC*, 584 F.2d 1067, 1070 (D.C.Cir.1978). *See Papago Tribal Utility Auth. v. FERC*, 610 F.2d 914, 920 (D.C.Cir.1980). Given the omission of revenue comparisons relevant to a major portion of its customers, FERC would have been within its rights in rejecting and returning the Company's submissions as inadequate for purposes of public notice. Instead, the Commission quite sensibly held the submissions until sufficient supplementation was received to complete the filing.

B. The Company also urges the inadequacy, under *Connecticut Light & Power Co.*, of this statement by the Commission of its reasons for imposition of the five months maximum period of suspension:

In a number of suspension orders,[9] we have addressed the considerations underlying the Commission's policy regarding rate suspensions. For the reasons given there, we have concluded that rate filings should generally be suspended for the maximum period permitted by statute where preliminary study leads the Commission to believe that the filing may be unjust and unreasonable or that it may run afoul of other statutory standards. We have acknowledged, however, that shorter suspensions may be warranted in circumstances where suspension for the maximum period may lead to harsh and inequitable results.

With respect to the rates filed in Docket No. ER81–341–000 [WPS–81], no such circumstances have been presented. Accordingly, those rates, as modified by summary disposition, will be suspended for five months from 60 days after completion of the filing, to become effective, subject to refund, on November 21, 1981. However, with respect to the rates filed in Docket No. ER81–267–000 [WPS–78], circumstances warranting a shorter suspension do exist.

---

[9] *E.g., Boston Edison Co.,* Docket No. ER80–508 (August 29, 1980) (five-month suspension); *Alabama Power Co.,* Docket Nos. ER80–506, *et al.* (August 29, 1980) (one-day suspension); *Cleveland Electric Illuminating Co.,* Docket No. ER80–488 (August 22, 1980) (one-day suspension).

*Order* at 5, J.A. at 266. The Company's arguments are foreclosed, however, by our very recent decision in *Southern California Edison Co. v. FERC,* 686 F.2d 43, 44 (D.C.Cir.1982), applying *Connecticut Light & Power Co.* to virtually identical language invoked by FERC to explain a five-month suspension. As *Southern California Edison* observed, "the Commission incorporated by reference the policy analysis on the suspension question set out in detail in three previous Commission orders." *Id.* at 45. Having thus provided the Company "with the analytical framework behind its decision to suspend," *id.* at 46, the Commission met the statutory requirement that it provide a statement of reasons for suspension. 16 U.S.C. § 824d(d).

The orders of the Commission are therefore

*Affirmed.*