**UNITED GAS PIPE LINE COMPANY,**
Petitioner,

v.

**FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.**

No. 82–1833.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 16, 1983.

Decided May 17, 1983.

Scott E. Rozzell, Houston, Tex., with whom Irving Jacob Golub, Cecil W. Talley, Phillip D. Endom, and Thomas W. Pounds, Houston, Tex., were on the brief, for petitioner.

Arlene Pianko Groner, Atty., F.E.R.C., Washington, D.C., with whom Barbara J. Weller, Deputy Sol., Washington, D.C., was on the brief, for respondent.

Before WILKEY and GINSBURG, Circuit Judges, and FRIEDMAN,* Circuit Judge, United States Court of Appeals for the Federal Circuit.

Opinion for the court filed by Circuit Judge GINSBURG.

Dissenting opinion filed by Circuit Judge WILKEY.

---

* Sitting by designation pursuant to 28 U.S.C. § 291(a).

GINSBURG, Circuit Judge:

United Gas Pipe Line Company (United), in its March 31, 1982, rate change filing with the Federal Energy Regulatory Commission (FERC),[1] included a "tracker" designed to apply to all of United's transportation costs and revenues. The proposed tracker, which would yield automatic, semi-annual rate adjustments, concededly contravened a longstanding rate regulation policy currently stated in an explicit FERC regulation.[2] FERC refused to waive the regulation and consequently rejected the portion of the filing providing for the all-inclusive

1. FERC has authority to regulate rates charged by interstate natural gas ·pipelines pursuant to the Natural Gas Act, 15 U.S.C. §§ 717–717w. United filed the tariff changes under section 4 of the Act, 15 U.S.C. § 717c, which provides in relevant part:

> (a) All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.

> . . . .

> (d) Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. . . .

> (e) Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, State commission, or gas distributing company, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate, charge, classification, or service shall go into effect. Where increased rates or charges are thus made effective, the Commission may, by order, require the natural-gas company to furnish a bond, to be approved by the Commission, to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts were paid, and, upon completion of the hearing and decision, to order such natural-gas company to refund, with interest, the portion of such increased rates or charges by its decision found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

2. The regulation, 18 C.F.R. § 154.38(d)(3), provides:

> No rule, regulation, exception or condition such as tax, commodity price index, wholesale price index or other similar price adjustments or periodic changes shall be included in the rate schedule or any other part of the tariff which in any way purports to effect the modification or change of any rate or charge specified in the rate schedule, or the substitution therefor of any other rate or charge: *Provided,* however, a natural-gas company may state in the service agreement or in rate schedules filed pursuant to § 154.52 that it is or will be its privilege, under certain specified conditions, to propose to the Commission a modification, change or substitution of the then effective rate or charge: *Provided further,* That no such clause may effectuate a change in an effective rate or charge except in the manner provided in section 4 of Natural Gas Act, as amended, and the regulations in this part.

The current text carries forward the original regulation, 13 Fed.Reg. 6371, 6374 (Oct. 30, 1948), but without the former prohibition against purchased gas adjustment clauses. *See* 37 Fed.Reg. 8376, 8377 (Apr. 26, 1972).

transportation tracker. The Commission recognized, however, that the time was ripe for fresh consideration of a tracker system for transportation costs and revenues.[3] It therefore stated that rejection of the filing was "without prejudice" to United's demonstration at the scheduled rate hearing that a transportation tracker should be adopted prospectively.

United's petition for review urges that FERC acted arbitrarily and abused its discretion when it denied the waiver and rejected the tracker. For the reasons stated below, we hold that the Commission exercised its discretion in a permissible, rational manner. We therefore have no warrant to disturb the course FERC is pursuing. Accordingly, we affirm the challenged Commission orders.

## I. BACKGROUND

On March 31, 1982, United filed with FERC, pursuant to section 4 of the Natural Gas Act,[4] a rate increase request. The primary reason for the filing, United stated, was "to reflect the impact of deliveries through the Northern Border Pipeline Company (Northern Border) system on United's costs ... and revenues." Joint Appendix (J.A.) 2. Because United's transportation costs have increased significantly in recent years and resist accurate prediction,[5] United proposed automatic, semi-annual rate adjustments to reflect any increase or de-crease in its transportation costs and revenues. This proposal ran directly counter to 18 C.F.R. § 154.38(d)(3), a FERC regulation excluding from tariffs "price adjustments or periodic changes ... which in any way purport[ ] to effect the modification or change of any rate or charge specified in [a] rate schedule."[6] United therefore invited FERC's waiver of the regulation. Alternately, in the event FERC denied the requested waiver, United proposed a tracker limited to the transportation of gas by Northern Border, the eastern leg of the Alaska Natural Gas Transportation System. J.A. 4.

In support of its principal proposal, United presented figures showing that from 1977 to 1981, its transportation costs had quadrupled; in United's March 31, 1982, filing, "the transportation cost component ... account[ed] for approximately 71 percent of [all] operating and maintenance expenses exclusive of gas costs." J.A. 10; see Brief of Petitioner 5. The proposed tracking mechanism, United asserted, "will assure that [it] neither overrecovers nor underrecovers these significant system costs." J.A. 6.

On April 30, 1982, FERC accepted and suspended most of United's filing, and ordered a public hearing concerning the lawfulness of the proposed rate increase. 19 FERC ¶ 61,081 (1982); J.A. 13–20.[7] The

---

**3.** This court has twice suggested that, in view of current conditions and the forecasting difficulties today's rate filings entail, FERC should bring its expert judgment to bear on the propriety of allowing tracker systems of the sort proposed by United. *Transcontinental Gas Pipe Line Corp. v. FERC,* 652 F.2d 179, 181 (D.C.Cir.1981); *Panhandle E. Pipe Line Co. v. FERC,* 613 F.2d 1120, 1133 & n. 66 (D.C.Cir. 1979), *cert. denied,* 449 U.S. 889, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980).

**4.** *See supra* note 1.

**5.** United urged particularly that "[t]he historical test period approach generally used to establish rates [with the adjusted period ending at or about the time the proposed rates become effective] will inevitably result in overrecovery or underrecovery of transportation costs and revenues not only because the volumes of gas transported for and by United may vary widely between periods but also because not all of the

pipelines transporting for United seek or achieve rate increases on a uniform schedule." Brief of Petitioner 6–7 (footnote omitted).

**6.** For the full text of the regulation, see *supra* note 2.

**7.** The maximum suspension period under section 4, *see supra* note 1, is five months. FERC suspended the operation of United's filing for the maximum period, *i.e.,* until October 1, 1982. J.A. 15. The accepted portions of United's filing are now in effect, subject to the Commission's authority to order refunds should it eventually find any increased rates unjust or unreasonable. The hearing was scheduled to begin on March 8, 1983, Brief for Respondent 3 n. 3, but at oral argument FERC's counsel stated that July 1983 is now the anticipated starting time.

Commission permitted United to track Northern Border transportation charges based on an earlier opinion authorizing such limited tracking, *Northwest Alaskan Pipeline Company,* 11 FERC ¶ 61,088 (1980),[8] but tersely declared that United "ha[d] not demonstrated good cause" for a broader, immediate waiver of the anti-tracking regulation. J.A. 16. The April 30, 1982, order noted, however, that FERC's denial of the waiver and consequent rejection of the all-inclusive transportation tracker at the filing stage [9] did not preclude any party from raising questions associated with this tracking mechanism in the scheduled hearing on the justness and reasonableness of United's proposed rates. J.A. 16 n. 4; *see* Brief for Respondent 3.

In a July 1, 1982, order denying United's rehearing application, 20 FERC ¶ 61,005 (1982); J.A. 29–32, FERC devoted several paragraphs to United's charge, J.A. 23–27, that the Commission's peremptory rejection of the unlimited transportation tracker furthered no sound regulatory policy and was therefore unlawful. First, FERC explained:

> We have disallowed these types of trackers because a just and reasonable rate under the Natural Gas Act is based upon a review of all costs incurred by a pipeline during the period used to determine those costs. Trackers, however, modify automatically a pipeline's rate to reflect a change in cost level of one item of cost. Thus, tracking an increase in cost level for one expense, *e.g.,* transmission costs of pipeline suppliers, does not consider any changes in a pipeline's other costs and revenues.

J.A. 30. FERC acknowledged that it had "excepted from the general prohibition against trackers" certain items of cost, including "purchased gas costs, research and development costs, and costs associated with the Louisiana First Use Tax." But rulemaking procedures, the Commission pointed out, not individual tariff filings, had been the vehicle for implementing such permanent tracking provisions. J.A. 30.[10] FERC also acknowledged that it had approved transportation trackers in rate settlement agreements, applicable for the life of the agreement, but the Commission distinguished these limited duration arrangements from trackers permanently featured in a pipeline's tariffs. J.A. 30–31. Finally, FERC indicated again that United would have an opportunity in the scheduled rate hearing to demonstrate why an unlimited transportation tracker should be adopted on a prospective basis. J.A. 31.

---

**8.** The Commission has also issued a notice of proposed rulemaking regarding shipper tracking of Alaska Natural Gas Transportation System charges. 47 Fed.Reg. 45021 (Oct. 13, 1982). In that notice, the Commission identified the "unprecedented scale and cost" of the Alaska system, "as well as its unique international character and legal framework," as factors justifying a departure from FERC's general policy, which continues to be "the disallowance of long-term authority to flow-through, or 'track,' third-party transportation charges." *Id.* at 45024.

**9.** Under the Commission's regulations, FERC "shall reject any material submitted for filing with the Commission which patently fails to substantially comply with the applicable requirements." 18 C.F.R. § 35.5. *See Kentucky Utils. Co. v. FERC,* 689 F.2d 207, 211 (D.C.Cir. 1982). As this court has stated:

> A "rejection" of a filing ... is ... like a motion to dismiss on the face of the pleading, and indeed goes even beyond that. It is appropriate where the filing is so deficient on its face that the agency may properly return it to the filing party without even awaiting a responsive filing by any other party in interest.
>
> It is "a peremptory form of response to filed tariffs" which classically is used not to dispose of a matter on the merits .... [But its] use is not limited to defects of form. It may be used by an agency where the filing is so patently a nullity as a matter of substantive law, that administrative efficiency and justice are furthered by obviating any docket at the threshold rather than opening a futile docket.

*Municipal Light Bds. v. Federal Power Comm'n,* 450 F.2d 1341, 1346 (D.C.Cir.1971) (footnote omitted), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972).

**10.** *See* 18 C.F.R. § 154.38(d)(4) (purchased gas costs); *id.* § 154.38(d)(5) (research development costs); *id.* § 154.38(h) (costs associated with the Louisiana First Use Tax); Brief for Respondent 6. *See also supra* note 8.

## II. DECISION

We deal first with the threshold question in this appeal, whether FERC arbitrarily denied United's request for a broad and immediate waiver of the Commission's regulation prohibiting cost trackers in rate schedules. Next, we turn to the two subsidiary issues United's petition presents: (1) whether, absent a threshold waiver, FERC abused its discretion in rejecting the unlimited transportation tracker proposed in United's filing; and (2) whether FERC's rejection of the proposed tracker at the filing stage, without prejudice to full airing of the matter at the section 4 rate hearing, constituted an indefinite suspension of a rate, in violation of the Natural Gas Act's five-month suspension limit.[11]

### A. *Waiver*

Judicial review of an agency's denial of a waiver application is tightly contained. *See WAIT Radio v. FCC,* 459 F.2d 1203, 1207 (D.C.Cir.), *cert. denied,* 409 U.S. 1027, 93 S.Ct. 461, 34 L.Ed.2d 321 (1972) (*WAIT II*); *Sudbrink Broadcasting, Inc. v. FCC,* 509 F.2d 418, 422 (D.C.Cir.1974). Challengers must show that the agency acted arbitrarily by failing to give "meaningful consideration" to the application. *See WAIT Radio v. FCC,* 418 F.2d 1153, 1159 (D.C.Cir. 1969) (*WAIT I*). In *WAIT I,* this court elaborated:

> The applicant for waiver must articulate a specific pleading, and adduce concrete support, preferably documentary. Even when an application complies with these rigorous requirements, the agency is not required to author an essay for the disposition of each application. It suffices, in the usual case, that we can discern the "why and wherefore."

*Id.* at 1157 n. 9.

FERC's initial denial of United's waiver request, stating, without explana-

tion, that United "ha[d] not demonstrated good cause," J.A. 16, was inadequate to indicate the "why and wherefore." In denying United's rehearing application, however, FERC explained its position. FERC cited its long-held policy of permitting rate adjustments only on the basis of a pipeline's total package of costs and revenues: Trackers for one portion of a pipeline's costs do not take account of offsetting changes in other costs or overall revenues and therefore might yield rates incompatible with the Act's "just and reasonable" standard. The Commission recognized that its traditional policy is less firm today in view of significant departures carved out through rulemaking procedures.[12] FERC also acknowledged its approval of "settlement agreements that incorporate third-party transportation cost trackers similar to that proposed by United." J.A. 30. While the Commission left open the possibility that it might change its policy should United renew the matter at the rate hearing,[13] FERC was unwilling to depart from its regulation and allow the broad waiver United sought in advance of a full airing of the matter at which views, other than those of United, could be presented. This explanation, while it might have been more expansive, enables us to discern the "why and wherefore" of the Commission's reasoning. FERC's denial of the waiver, pre-hearing, in view of the Commission's long-held, recently reiterated policy,[14] we conclude, was not based on grounds "so insubstantial as to render [the] denial an abuse of discretion." *WAIT II, supra,* 459 F.2d at 1207.

### B. *Rejection*

A tariff filing is appropriately rejected if it is "patently . . . either deficient in form or a substantive nullity." *Munici-*

---

11. *See supra* notes 1 & 7.

12. In its brief on appeal, FERC noted that United "has the right to petition the Commission to revise the rule prohibiting transportation trackers." Brief for Respondent 14 n. 8. United, it appears, has not elected to pursue the rulemaking route.

13. However, at oral argument, FERC's counsel informed the court that a filing by Commission staff in the scheduled rate hearing opposed allowance of the transportation tracker United requested.

14. *See supra* note 8.

*pal Light Boards v. Federal Power Commission, supra* note 9, at 1345. The Commission does not urge that United's proposed transportation tracker is a "substantive nullity." Brief for Respondent 7, 9. However, the tracker permits adjustments that FERC regulations prohibit. In face of 18 C.F.R. § 154.38(d)(3),[15] the Commission treated the filing as plainly "deficient in form." Our conclusion that FERC did not act without reason in refusing to waive the regulation in advance of the section 4 hearing, at which time the Commission could receive presentations not only from United but from others as well, virtually answers this first subsidiary question. A filing is "deficient in form" if it is inconsistent with Commission regulations. FERC is not obligated to reject a defective filing, *see Papago Tribal Utility Authority v. FERC,* 628 F.2d 235 (D.C.Cir.), *cert. denied,* 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980), but neither is it required to accept such a filing. Particularly in view of the "broad discretion" FERC has to determine whether a filing substantially complies with its regulations, *City of Groton v. FERC,* 584 F.2d 1067, 1070 (D.C.Cir.1978), we regard FERC's decision to reject the unlimited transportation tracker portion of the filing, once a threshold waiver was properly denied, as a permissible exercise of the Commission's discretion.

## C. Indefinite Suspension

■ United characterizes the Commission's rejection of its proposed tracker, without prejudice to development of an evidentiary record at the section 4 hearing, as a "hybrid" procedure unauthorized by the Natural Gas Act; in essence, United asserts, FERC's action indefinitely suspends a portion of United's rate filing, in violation of the Act's five-month suspension limit.[16] Brief of Petitioner 17–18; Reply Brief of Petitioner 6–7. United's argument, embraced in the dissenting opinion, would limit FERC to three choices: the Commission could accept a filing and allow the rates to become effective without suspension; it could accept and suspend for up to five months; or it could reject the filing "with prejudice" to reconsideration at the rate hearing.

We do not read the Act to preclude the course FERC is taking.[17] FERC might have rejected the tracker unconditionally, thereby denying United any immediate opportunity for further airing of the matter and remitting United to a petition for a rulemaking procedure as the only administrative route to reassessment of the Commission's long-held position on permanent transportation trackers. United conceded as much at oral argument. Far from truncating United's rights under the Act, FERC argues and we agree, the Commission has accorded United "more than the minimum required by law." Brief for Respondent 16.[18]

In short, we discern no harm to United nor any statutory roadblock to FERC's ap-

---

15. *See supra* note 2.

16. *See supra* notes 1 & 7.

17. *See Kentucky Utils. Co. v. FERC, supra* note 9, at 211, holding that FERC acted within its discretion when it delayed assignment of a "filing date" to a filing which did not substantially comply with FERC regulations. Under the Commission's regulations, the "filing date" is "the date on which a rate schedule is completed by the receipt in the office of the Secretary [of the Commission] of all supporting ... data required to be filed in compliance with the requirements of this part, *unless such rate schedule is rejected.*" 18 C.F.R. § 35.2(c) (emphasis added). If a filing is complete but rejected, no filing date is assigned which means the tendered filing was never recognized as filed. Any rates contained in a rejected filing,

therefore, will be ineffective, just as if the rates had never been proposed.

Under section 4, FERC cannot suspend a filing "for a longer period than five months beyond the time when it would otherwise go into effect." The five-month suspension limit, then, applies to filings which "would otherwise go into effect." Because a rejected filing will *never* go into effect, the five-month suspension limit is inapplicable.

18. While we lack authority to command an agency to afford a petitioner a procedural opportunity not required by law, *see Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978), the agency *itself is not similarly limited.*

proach, which permits development of the tracker issue "in the give and take of a hearing, with an opportunity for others to participate"; "if the Commission does permit a transportation tracker, it will do so on a prospective basis, as it did in the rulemakings [authorizing other permanent trackers]." Brief for Respondent 14. FERC's procedure not only affords United a reasonably prompt, full hearing, it also facilitates ultimate judicial review of FERC's final decision. With a well-developed factual record, both the Commission and a reviewing court will be better situated to determine whether FERC's traditional position on permanent transportation trackers continues to rest on solid ground or has become obsolete.[19]

## CONCLUSION

For the reasons stated the orders under review are

*Affirmed.*

WILKEY, Circuit Judge, dissenting:

Although our authority to review agency decisions like the present one is very limited,[1] I must nevertheless disagree with the majority's conclusion that the orders under review are sustainable. The reasons given by the Commission for refusing to grant the requested waiver fail to establish that any meaningful consideration was given to that request, and the Commission's attempt to rectify that error by allowing a reconsideration of that issue in a section 4 proceeding

only aggravates the problem. Accordingly, I dissent.

In order to justify its refusal to grant United's waiver request, the Commission must provide the "why and wherefore" of its decision.[2] However, the mere articulation of reasons is not sufficient if the proffered rationale indicates that the Commission failed to give "meaningful consideration" to the request.[3] The majority acknowledges that the Commission's initial denial was inadequate in this respect, but concludes that the defect was remedied by the Commission's explanation in its denial of United's rehearing application.[4] I agree that the initial denial was insufficient, but I fail to see how the explanation provided in the rehearing denial was any more meaningful.

The Commission's initial denial simply stated that United "ha[d] not demonstrated good cause" for waiving the general rule.[5] This is not an adequate explanation of the Commission's actions. The "bare statement that the application does not present a sufficient basis for waiver is a conclusion, not a reason."[6] The explanation advanced in the rehearing denial is equally inadequate. In the rehearing denial, the Commission articulated the policy behind the general rule prohibiting trackers, conceded that the policy was less firm today than it had been in the past, acknowledged that it had approved transportation trackers in settlement agreements (which, unlike United's proposal, were temporary), and then simply stated "[United's] contentions provide no basis to deviate from the Commission's reg-

**19.** When this court suggested that current conditions may have overtaken the Commission's decades-old position on trackers, *see supra* note 3, it was careful to avoid expressing any opinion "on the appropriate course of action," because "this matter should be left to the expert judgment of the Commission in the first instance." *Transcontinental Gas Pipe Line Corp. v. FERC, supra* note 3, at 181. *See also Panhandle E. Pipe Line Co. v. FERC, supra* note 3, at 1133 n. 66 (while court cannot force Commission's hand, FERC might begin approving tracking clauses in individual section 4 proceedings or, by rulemaking, might adopt a policy allowing inclusion of such clauses in rate filing under section 4).

**1.** *See WAIT Radio v. FCC,* 459 F.2d 1203, 1207 (D.C.Cir.), *cert. denied,* 409 U.S. 1027, 93 S.Ct. 461, 34 L.Ed.2d 321 (1972) (*WAIT II*).

**2.** *WAIT Radio v. FCC,* 418 F.2d 1153, 1157 n. 9 (D.C.Cir.1969) (*WAIT I*).

**3.** *Id.* at 1159.

**4.** Majority Opinion at 1511.

**5.** Joint Appendix (JA) at 16.

**6.** *WAIT I,* 418 F.2d at 1158 n. 12.

ulations." [7] At most, the Commission's explanation established that the general rule was still valid (although less so than it was previously), but it *completely failed* to address United's *main arguments.* This cavalier dismissal of United's arguments, without explanation, is not indicative of any meaningful consideration.

The arbitrary nature of the Commission's denial is highlighted by an examination of the arguments advanced by United. United first argued that the policy behind the general rule—the desirability of considering *all* of a company's costs in determining whether rates are just and reasonable— would not be served to any appreciable degree by prohibiting the proposed tracker. It then contended that overall fairness to the company and the consumer would be better served by permitting an automatic adjustment in response to changes in its transportation costs. When examined, these two arguments appear to be persuasive. Yet the Commission did not discuss them at all.

In support of its first argument—that the policy behind the general rule would not be advanced by its application in this case— United presented evidence that transportation costs (the costs it wished to track) accounted for seventy-one percent of all its operating and maintenance expenses exclusive of gas costs.[8] Thus, United argued, any offset created by a decrease in other costs would likely be minimal (even assuming, as seems unlikely, that other costs would decrease when transportation costs were increasing). Accordingly, United asserted that there was little need to examine all of its costs before every adjustment. In addition, and equally important, United argued, *all* of the transportation costs it sought to track were rates paid to other pipelines which were already subject to Commission review and approval.

Most of the transportation costs incurred by United are rates paid to *interstate* pipelines which are required to gain Commission approval of their rates under the "just and reasonable" standard of section 4,[9] the same section the Commission would apply in determining whether to approve United's rates. The Commission itself has noted that "as a practical matter, to the extent the transportation . . . charges are levied by other *interstate* pipelines, they *must* be just and reasonable." [10] The remainder of United's transportation costs are rates paid to *intra* state pipelines which, while not regulated under the Natural Gas Act, are governed by section 311(a)(2) of the Natural Gas Policy Act.[11] Under section 311(a)(2) the Commission is required to review all rates to determine that they are "fair and equitable." [12] The difference between rates which are "fair and equitable" and those which are "just and reasonable" is rendered academic by section 601(b)(2) of the Natural Gas Policy Act which provides:

> For purposes of sections 4 and 5 of the Natural Gas Act, any amount paid by an interstate pipeline for any transportation authorized by the Commission under section [311(a)] shall be deemed to be just and reasonable if such amount does not exceed that approved by the Commission under such section.[13]

Thus, transportation rates approved as "fair and equitable" under section 311(a)(2) of the Natural Gas Policy Act are automatically considered "just and reasonable" costs under section 4 of the Natural Gas Act and, as the Commission itself has observed, "once [it] determines that a Section 311(a)(2) rate is 'fair and equitable', the transportation charges are guaranteed to be passed through to interstate pipeline rate-

**7.** JA at 31.

**8.** JA at 10.

**9.** 15 U.S.C. § 717c (1976).

**10.** *United Gas Pipe Line Co.,* FERC Docket No. RP 77–107 (30 July 1979) (order approving settlement agreement) (emphasis added).

**11.** 15 U.S.C. § 3371(a)(2) (Supp. V 1981).

**12.** *Id.,* § 3371(a)(2)(B).

**13.** *Id.,* § 3431(b)(2)(B).

payers by operation of Section 601(b)(2) of the NGPA."[14]

Therefore, *all* of the costs United sought to track in its rejected rate filing were costs which the Commission would have to approve as just and reasonable within the meaning of section 4. When this fact is added to United's evidence that these costs made up seventy-one percent of its operating and maintenance expenses, the result is a forceful argument that permitting a tracker of the sort proposed by United would not implicate the policy behind the general rule. It would be highly unlikely that an increase in rates which was triggered by an increase in costs already determined to be just and reasonable would be unjust or unreasonable, or that it would be offset to any significant degree by a decrease in the remaining twenty-nine percent of United's costs.

United's second argument is also compelling. United argued that any minimal benefit which might come from adhering to the general rule would be counterbalanced by the benefits to both United and its customers. Because transportation costs had fluctuated so dramatically over the past five years,[15] United argued that unless a tracker was approved it might be unable to use its newer gas reserves, which were remote from its current mainline system, because of the uncertainty involved in the transportation costs.[16] Tracking the costs would enable United to develop these newer reserves. At the same time, United stated, its customers would benefit because, while the general trend of transportation costs has been upward, there are short periods of time when transportation costs decrease.[17] Without the tracker, customers would be deprived of any reduction which did not last for a substantial period of time, while under the tracker any intra-period reductions in cost would flow through to the customer.[18] United therefore argued that "[t]he historical test period approach generally used to establish rates will inevitably result in overrecovery or underrecovery of transportation costs and revenues"[19] because the delay in preparing, filing, and approving rates often results in rates based on transportation costs of a one year period which ended eight months before the rate becomes effective.[20] United asserted that this inequity, which could hurt both United and its customers, would be avoided under its proposed tracker.

In sum, United presented two compelling arguments that its waiver request should be granted. Meaningful consideration by the Commission *may* have revealed that these arguments were flawed in some respect, but the Commission *did not address them at all,* either in its initial denial or its denial of United's rehearing request. When logical arguments like those advanced by United

---

14. *Louisiana Intrastate Gas Corp.,* Docket No. CP 81–333, 18 FERC ¶ 61,034 (18 Jan. 1982).

15. United presented evidence that over a five year period, its transportation costs were as follows:

    1977—$ 34,000,000
    1978—$ 21,000,000
    1979—$ 56,000,000
    1980—$ 90,000,000
    1981—$137,000,000
JA at 10.

16. *Id.*

17. Between 1977 and 1978 United's transportation costs *dropped* $13,000,000, but that was followed by an increase of $35,000,000 in the subsequent year. *See supra* note 15.

18. JA at 10.

19. Petitioner's Brief at 6–7 (footnote omitted).

20. United noted that:

Under the historical test year approach rate filings are based on the most recent twelve months of actual data adjusted to reflect known and measurable changes to occur during the subsequent nine months. 18 C.F.R. § 154.63(e)(2). Given the time required to prepare a filing and the Commission's policy of suspending major filings for five months, as a general rule the adjusted test period ends at or about the time the proposed rates become effective. For example, United's rate filing in this case was made March 31, 1982 and based on actual costs for the twelve months ended January 31, 1982 adjusted for changes expected to occur through October 31, 1982. The rates became effective, after suspension, on October 1, 1982.

Petitioner's Brief at 6 n. 7.

are rejected without *any* discussion of their merits, it is difficult to see how they could have been meaningfully considered.

The Commission's failure to consider United's waiver request in any meaningful way is further evidenced by its willingness to accept United's alternative filing which included a tracker for transportation costs related to the Northern Border Pipeline Co. This tracker is *identical* to the one rejected by the Commission except that it relates to only one pipeline. The reasons advanced by the Commission for *rejecting* United's waiver request, such as they are, *apply equally* to the tracker *accepted* by the Commission. Allowing United to track its Northern Border transportation costs would also increase the possibility that United would be allowed to charge higher rates despite a possible decrease in its overall costs. Indeed, the likelihood was greater that the Northern Border transportation costs would be offset by a decrease in other costs because the Northern Border costs comprise a smaller share of United's total operating expenses. If, as the Commission asserted, the possibility that reductions in other costs would offset increases in the transportation costs is, *by itself*, reason to deny United's application for a waiver, why does it not also preclude United from tracking those same costs charged by the Northern Border Pipeline Co.?[21] Again, I can only conclude that the Commission failed to consider the arguments advanced by United, and chose instead to deny United's waiver request without examining its merits.

Equally disturbing is the Commission's attempt to justify its actions by asserting that "there has been no final determination by the Commission denying United a transportation tracker [since] United will be permitted to show in an evidentiary hearing why it should be granted waiver of the rule prohibiting such trackers."[22] The Commission's attempt to justify its decision by granting United a second chance is disturbing for two reasons.

First, it is further evidence that the Commission has *not yet* considered whether a waiver is appropriate, despite its summary rejection of the waiver request. If United's waiver request was so meritless as to deserve the summary rejection it received, why consider it again in the section 4 hearing? It seems that the Commission was acting under the pangs of a stricken conscience. Apparently realizing that it had no good reason for summarily rejecting United's waiver request, the Commission decided to delay meaningful consideration of the issue until later. This only underscores the arbitrariness of its initial decision to reject the waiver request.

Second, the Commission's actions are disturbing because they demonstrate the Commission's disregard for the procedure Congress outlined for cases which merit a section 4 hearing. The hearing procedure contained in section 4 was designed for cases which are not easily decided. Since a delay in consideration can cost either consumers or producers millions of dollars, the procedure was structured to protect the interests of all the parties involved. Thus, section 4 enables the Commission to fulfill its responsibility of determining whether rates are just and reasonable by giving it the power to hold a hearing before making a final decision on the validity of the rates. At the same time, consumers can be protected from having to pay rates which are ultimately determined to be unjust because the Commission can temporarily suspend the effective date of the rates pending the out-

21. The Commission seeks to justify its decision to reject one of United's proposed trackers while accepting the other by citing a notice of proposed rulemaking in which the Commission explains why the general rule may not apply to the Alaska Natural Gas Transportation System of which the Northern Border Transportation Co. is a part. Respondent's Brief at 11–12. *See* Majority Opinion at 1510 n. 8; *id.* at 1511 n. 14. However, this notice issued three months *after* the rehearing denial. A subsequently articulated rationale cannot be used as a basis for sustaining the Commission's earlier decision. *See WAIT I,* 418 F.2d at 1158 & n. 13. And in any event, the Commission's actions merely strengthen United's general argument that the rule prohibiting trackers should not apply in all circumstances.

22. Respondent's Brief at 13–14.

come of the hearing and the gas company can be required to refund any excess charges. Equally important, section 4 provides protection for the interests of the gas company by limiting the suspension period to five months. However, in this case the Commission decided not to grant that protection to United. I see no justifiable reason for that action.

Unlike the consumer, a gas company cannot recover its share of the rates if its position is ultimately vindicated. Accordingly, Congress expressly provided that rates on which a section 4 hearing was being held could not be suspended for longer than five months. The Commission is thereby prohibited from indefinitely delaying the effective date of a rate merely because it cannot, or will not, make up its mind on the validity of the proposed rates. Thus, if the Commission determines that there is sufficient merit in a rate proposal to warrant a section 4 hearing, it should limit the length of its deliberations to five months or allow the proposed rates to go into effect, subject to a refund order. This is the *only* way the gas company's interests can be adequately protected. As this court has observed:

> The suspension and refund provisions of § 4 protect regulated companies against deprivation of the substantial rights of covering the costs of doing business and earning a fair return on investment. *By enacting § 4, Congress recognized those rights as substantial, and sheltered them from dissipation through regulatory lag or indecision.*[23]

Despite its summary rejection of United's waiver request, it is obvious that the Commission has yet to determine whether United's tracker proposal is acceptable. The Commission's delay in deciding this admittedly difficult question might be justifiable if United were receiving the protection section 4 was designed to give it. As it is, the Commission has, without meaningful con-

sideration, rejected United's request and indefinitely postponed its real deliberations without providing United any assurance that it will be able to collect rates which may ultimately be found just and reasonable. I would remand the case to the Commission with instructions immediately to consider the tracker proposal and either reject it on the basis of legitimate reasons or accept it for filing. If a hearing is necessary, the Commission should accept the filing and, if appropriate, suspend its effective date, but not for more than five months.

The majority's invocation of *Vermont Yankee* seems to imply that I would require the Commission to do something "not required by law."[24] However, my proposed disposition would merely require the Commission to conform its action *to the statute.* Under the statute the Commission is free to reject the proposed tracker without holding a hearing if it can supply a legitimate reason for doing so. It is also free to reject the proposal after a hearing if it feels that a hearing is necessary. But, if the Commission determines that the proposal has sufficient merit to warrant a section 4 hearing, *the statute* prevents it from delaying the effective date of the proposed filing "for a longer period than five months."[25] Thus, the *statute* requires the Commission to act; it prevents the Commission from dissipating United's rights through regulatory lag or indecision.[26] The Commission's efforts to circumvent this statutory scheme should not be countenanced.

---

**23.** *Algonquin Gas Transmission Co. v. FPC,* 534 F.2d 952, 956 (D.C.Cir.1976) (emphasis added).

**24.** Majority Opinion at 1512 n. 18.

**25.** 15 U.S.C. § 717c(e) (1976).

**26.** *See Algonquin Gas,* 534 F.2d at 956.