**ICBC CORPORATION, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**
**CBS, Inc., Intervenor.**

No. 82–1342.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 3, 1982.
Decided Sept. 2, 1983.

Arthur B. Goodkind, Washington, D.C., for appellant.

L. Andrew Tollin, F.C.C., Washington, D.C., with whom Stephen A. Sharp, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., were on brief, for appellee.

Timothy B. Dyk, Washington, D.C., with whom John W. Zucker, Washington, D.C., was on brief, for intervenor, CBS, Inc.

Before WALD, BORK and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

Appellant ICBC Corporation appeals from a decision of the Federal Communications Commission rejecting ICBC's request for waiver of an FCC rule designed to prevent interference among AM radio stations. The waiver requested was necessary to allow filing of ICBC's application for a license for nighttime service of its black-owned and black-oriented AM station, which has been operating only during the day since 1972. ICBC contended before the Commission that the rule should be waived because the proposed nighttime service would not adversely affect any area already receiving satisfactory service and would be consistent with the FCC's own minority-ownership and minority-service policies.

The Commission refused to waive the allocation rule on the grounds that ICBC's proposed violation was not warranted on technical grounds; that "service" considerations did not justify waiver of the rule; and that, in particular, ICBC's status as a black-owned and -operated station providing service aimed at a black audience was not a "relevant factor" where this particular rule was concerned, because this rule, unlike others that had been waived for service-related reasons, was fundamental to the overall AM allocation scheme. We affirm the Commission's decision.

I.

Appellant ICBC, the subsidiary of a company all of whose officers and directors and most of whose stockholders are black, currently holds the licenses for two radio stations in New York City that aim chiefly to serve black audiences: WBLS, an FM station, and WLIB, an AM station. Although WBLS operates round the clock, WLIB op-

erates only during the day. WLIB, a "Class II" AM station, shares a frequency (1190 KHz) with a station in Fort Wayne, Indiana, which, as a "Class I–B" station, has dominant rights. Even though Fort Wayne is far enough away from New York to prevent any interference during the day, nighttime operation of WLIB would, because AM radio signals carry much farther at night, cause extensive interference between it and the Fort Wayne station.

In 1980 the FCC adopted changes that ICBC saw as an opportunity to extend WLIB's service to nighttime hours. That year the Commission made available certain channels, called "clear channels," each of which had previously been reserved for a single Class I–A station's long-distance broadcasting. The Commission based its decision on the judgment that the need for local stations was not being adequately met, and it deemed the need for more minority-owned stations one of the major needs that the availability of new stations could meet. To encourage the creation of such stations, the Commission relaxed certain requirements for those new nighttime operations that were in markets already served by many local stations and that were more than fifty percent minority owned. The requirement of compliance with the basic signal contour rule of 47 C.F.R. § 73.37(a) (1982), however, was in no way relaxed. *See Clear Channel Broadcasting in the AM Broadcast Band,* 78 F.C.C.2d 1345, 1368–69 (1980).

One of the clear channels made available was 1200 KHz, a frequency on which the dominant Class I–A station was a station in San Antonio, Texas, which is far enough from the east coast of the United States to allow for licensing of at least one east coast station on 1200 KHz without creating significant interference. Because interference is created by stations not only on the same frequency but also on frequencies close to each other on the dial, WLIB, operating on 1190 KHz in New York City, was the only station in the New York City area that could be eligible for the 1200 KHz channel. ICBC filed an application with the Commission to change WLIB's frequency from 1190 KHz to 1200 KHz and to extend its hours of operation from daytime only to round the clock. ICBC recognized, however, that WLIB's proposed operation would interfere, in violation of section 73.37(a) of the Commission's rules, with the signal of WCAU, a Class I–A station in Philadelphia operating at 1210 KHz.

Section 73.37(a) protects stations from interference by prohibiting the Commission's acceptance of any application for a new operation that would infringe to a specified degree any existing station's "signal strength contour." Signal strength is designated in millivolts per meter, or mV/m, and a station's 0.5 mV/m signal strength contour (or "signal contour" or "contour"), for example, is the area within which the station's signal strength is 0.5 mV/m or greater. Section 73.37(a) specifies prohibited overlaps of signal contours for various combinations of existing and proposed stations, the prohibitions being strictest for stations on the same frequency and less strict for stations on nearby but not identical frequencies. As it applies to this case, section 73.37(a) would prohibit WLIB's proposed operation because its 0.5 mV/m signal contour would overlap that of WCAU. It is undisputed that the overlap area measures approximately 450 square miles and has approximately five million residents.

In its request for waiver of section 73.-37(a), ICBC stated that grant of the waiver would make possible the survival of WLIB, which was New York City's only black-owned AM radio station and which had not been financially successful operating only during the day. ICBC also stated that WLIB's proposed operation would serve a black audience of more than two million people in New York and New Jersey. ICBC went on to argue that WLIB's proposed operation "would not adversely affect WCAU in any area deemed to be served by that station under the FCC's Rules." Brief for Appellant at 10. ICBC noted that no part of the overlap area is within forty-five miles of Philadelphia and contended that WCAU does not purport to serve the New York area. Moreover, ICBC argued, no

WCAU listener would be deprived of adequate service because the entire area of overlap between WCAU and WLIB's proposed operation is an "Urbanized Area," under Commission rules, within which signals of less than 2.0 mV/m do not provide adequate service, and the 2.0 mV/m contour of WCAU would not overlap WLIB's 0.5 mV/m contour at all. Finally, ICBC contended, even if some WCAU listeners would lose service from WCAU, they would not lose service entirely but rather would gain WLIB service, which would be directed at the New York (as opposed to Philadelphia) market where those listeners resided. In sum, ICBC requested waiver on the grounds (1) that licensing of WLIB's proposed operation would advance the FCC's policy of encouraging stations that are minority-owned or serve minority audiences and (2) that the infringing signal would not significantly affect WCAU's primary service.

The Commission initially denied ICBC's request for waiver in a letter returning ICBC's application. J.A. 11–12. The Acting Chief of the AM Branch, Broadcast Facilities Division, Broadcast Bureau, stated in the letter that, "[i]n formulating Section 73.37(a), the Commission recognized that terms such as 'service' are relative and ambiguous." J.A. 11. It was for that reason, he explained, that section 73.37(a) was adopted as a rule establishing "strict 'go/no-go' standards to which all applications must conform." Id. ICBC's request for waiver was denied because it did "not address the basic policy considerations underlying Section 73.37(a) or establish that the public interest would be served by exempting [ICBC] from those requirements." Id.

ICBC appealed this denial to the full Commission, which upheld the AM Branch decision. In its Memorandum Opinion and Order, the Commission observed that prior to the adoption of section 73.37(a) in 1964, AM stations were assigned "on a 'demand' basis, with applicants free to seek new facilities in any community where a frequency could be found." J.A. 32. This practice, the Commission noted, permitted rapid proliferation of AM stations but led to "a dero-

gation of engineering standards," with the result that service was impaired in the outermost regions of protected service areas, extension of interference-free service to new suburbs became impossible, and few unused channels remained for new service in underserviced areas. Id. Section 73.37(a) replaced the flexible, ad hoc approach with a "go-no-go" rule to prevent further derogation of standards. J.A. 33.

The Commission addressed ICBC's particular contentions against this background. First, the Commission said, it "cannot accept [the] proposition" that ICBC's "status as a minority owned and operated facility is a relevant factor where Section 73.37(a) is concerned." J.A. 33. That was so because section 73.37(a) "recognizes signal strength contours and specified overlap as the sole criteria of acceptance. Considerations of a nontechnical nature play no role in its application." Id. (footnote omitted). The Commission stated that consideration of nonengineering reasons for waiver was partially responsible for the pre-1964 confusion. J.A. 33 n. 2. It further stated that section 73.37(a) differed significantly from section 73.37(e), to which minority ownership and operation were relevant, in that the latter section, unlike the former, "encompasses all of the public interest factors favoring one demand for spectrum space over another." J.A. 33.

Turning to ICBC's second argument, the Commission said that it had not been persuaded "that waiver [was] warranted on technical grounds." J.A. 33. Like the AM Branch Acting Chief, the Commission denied the relevance to a waiver request of ICBC's allegation that WLIB's proposed operation would have no effect on the "primary service" area of WCAU. It reaffirmed that the "relative and ambiguous" concept of service, and the "case by case determination of 'service'" to which use of the concept would inevitably lead, had been specifically and deliberately rejected when section 73.37(a) was adopted. Id. "Insofar as the applicant's claim of de minimis overlap is concerned," the Commission went on, "an area of approximately 450 square miles

can hardly be dismissed in this manner." J.A. 33–34. In this regard, the Commission pointed out that ICBC's case was quite different from the several cases in which waivers to section 73.37(a) had been granted. J.A. 34. The Commission also distinguished the case of *Newcastle Broadcasting Corp.,* 1 F.C.C.2d 1124 (1965), on which ICBC relied for its argument that the FCC had previously departed from its practice of strict enforcement of the signal contour rule: although a waiver was initially granted, the license application was later dismissed "when the overlap proved substantial. *Newcastle Broadcasting Corp.,* 11 FCC 2d 523 (1968)." J.A. 34 n. 3.

The Commission concluded its opinion with the following paragraph:

One final observation is appropriate here. In declining to waive Section 73.-37(a) on ICBC's behalf, we do not reject out of hand its assertion that a 24-hour minority oriented AM service would benefit the people of New York City. Rather, we conclude simply, this benefit is outweighed by the stronger public interest in maintaining the integrity of our AM allocation scheme as a whole.

J.A. 34. It accordingly denied ICBC's application for review of the initial denial of waiver. ICBC now appeals the Commission's ruling as arbitrary and capricious.

## II.

In *United Gas Pipe Line Co. v. FERC,* 707 F.2d 1507 (D.C.Cir.1983), we recently summarized the standards that govern our decision in a case presenting a challenge to an agency refusal to waive one of its own regulations:

Judicial review of an agency's denial of a waiver application is tightly contained. Challengers must show that the agency acted arbitrarily by failing to give "meaningful consideration" to the application.

. . . . .

The applicant for waiver must articulate a specific pleading, and adduce concrete support, preferably documentary. Even when an application com-

plies with these rigorous requirements, the agency is not required to author an essay for the disposition of each application. It suffices, in the usual case, that we can discern the "why and wherefore."

*Id.* at 1511 (citations omitted) (quoting *WAIT Radio v. FCC,* 418 F.2d 1153, 1159, 1157 n. 9 (D.C.Cir.1969)). We assume that appellant in this case met rigorous standards in the pleadings and proof it presented to the FCC. It is nonetheless clear that the FCC did not act "arbitrarily by failing to give 'meaningful consideration' to the application" for waiver, for "we can discern the 'why and wherefore'" of the denial of waiver. *Id.*

In *United Gas Pipe Line Co.,* the agency met this legal standard for denial of waivers by explaining that to grant the waiver would be inconsistent with a long-held policy that was a valid—*i.e.,* a rational—implementation of a statutory "just and reasonable" standard. The agency's explanation was held sufficient even though the policy relied on was less firm, because of exceptions made by rulemaking, than it had once been. The agency had, moreover, expressed a willingness to consider changing the policy, but, the agency said, it would do so only in a proceeding at which the views of persons other than the party seeking waiver could be fully aired.

The FCC here gave an explanation that was more expansive than, though in some respects analogous to, that given in *United Gas Pipe Line Co.* The Commission relied on its policy of rigid application of the "go/no-go" aspect of the signal contour rule, 47 C.F.R. § 73.37(a). The Commission has consistently applied that policy since its adoption in 1964, *see Newcastle Broadcasting Corp.,* 11 F.C.C.2d 523 (1968) (rejecting application when assumption that there was "no prohibited overlap," made at time application had been accepted for filing, was found to be false); *Major Market Stations, Inc.,* 4 Rad.Reg.2d (P & F) 650 (1965) (noting "over-all policy of strict enforcement" of section 73.37(a)), making exceptions to section 73.37(a) only in cases where contour

overlap was truly *de minimis* or where the signal contour of the existing station was already overlapped by another station's contour. *See, e.g., Home Service Broadcasting Corp.,* 66 F.C.C.2d 252 (1977) (0.2 square mile overlap); *Teche B/casting Corp.,* 30 Rad.Reg.2d (P & F) 201 (1974) ("minimal" overlap); *Collier Broadcasting Co.,* 25 F.C. C.2d 867 (1970) (15 persons in overlap); *Larson-Irwin Enterprises,* 6 F.C.C.2d 613 (1967) (300 persons in overlap); *B & K B/casting Co.,* 4 Rad.Reg.2d (P & F) 861 (1965) (preexisting overlap). ICBC's application presents a potential new overlap of 450 square miles in populated areas, and section 73.37(a) employs a definition of "service" unrelated to the notion of "primary service" on which ICBC relies. It is clear, therefore, that the "go/no-go" policy supports the denial of waiver. If the FCC's adherence to that policy is valid, the denial of waiver must be upheld.

The FCC's policy, like the agency policy at issue in *United Gas Pipe Line Co.,* is a rational implementation of the FCC's statutory mandate to "[m]ake such regulations not inconsistent with law as it may deem necessary to prevent interference between stations." 47 U.S.C. § 303(f) (1976). The policy of refusing to consider "non-technical" reasons for waiver of section 73.37(a)—such as arguments relating to "primary service" or to minority ownership and service—was based on the FCC's well-supported conclusion that considerable confusion had resulted from the agency's contrary policy prior to 1964. The pre-1964 experience provides a rational basis for the "go/no-go" policy, and that is all that is necessary. We conclude that the FCC's reaffirmation of its commitment to a "go/no-go" policy for section 73.37(a) reflects "meaningful consideration" of ICBC's nontechnical, service-related arguments for waiver and, consequently, that the policy is not arbitrary and capricious.

*KCST–TV, Inc. v. FCC,* 699 F.2d 1185 (D.C.Cir.1983), which reversed an FCC denial of waiver, is not to the contrary. The FCC there had not adopted or expressed any rationally supported policy of refusing to grant waivers to the rule at issue on the grounds raised in the waiver application before it. There being no apparent policy basis for the denial of the waiver, the case was remanded for Commission reconsideration. In the present case, the Commission's denial of a waiver has a rational policy basis.

*Garrett v. FCC,* 513 F.2d 1056 (D.C.Cir. 1975), which reversed an FCC refusal to consider minority ownership, is likewise entirely consistent with the result we reach here. *Garrett* concerned competitive applications to construct new facilities. There was no problem of interference with another station's signal. The question was whether minority ownership was to be considered in a request for a waiver of coverage rules that the applicant could not meet. The FCC had granted waivers in similar cases in the past. The rule at issue was one whose application required consideration of the benefits of proposed new service; it was not a "go/no-go" rule. This court held that, in such circumstances, it was error for the FCC to refuse to consider minority ownership among the benefits. The signal contour rule here, by contrast, was specifically adopted as a "go/no-go" rule in order to eliminate consideration of service benefits of any sort, including, therefore, benefits resulting from minority ownership. This rule has never been waived for nontechnical reasons, and the FCC has given adequate reasons why it should not be.

The decision of the Federal Communications Commission is

*Affirmed.*