CITY OF ANGELS BROADCASTING,
INC., Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

Fidelity Television, Inc., RKO General,
Inc., Intervenors.

No. 83–1741.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 8, 1984.

Decided Sept. 28, 1984.

Frank H. Penski, New York City, with whom Stephen Kurzman and Shelby D. Green, Washington, D.C., were on brief, for appellant.

J. Roger Wollenberg, Washington, D.C., with whom Joel Rosenbloom, Harold David Cohen, William H. Fitz and Jack N. Goodman, Washington, D.C., were on brief, for intervenor, RKO General, Inc.

Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., with whom Bruce E. Fein, Gen. Counsel and Sue Ann Preskill, Counsel, F.C.C., Washington, D.C., were on brief, for appellee.

Nathaniel F. Emmons, Washington, D.C., with whom Eugene F. Mullin, Washington, D.C., was on brief, for intervenor, Fidelity Television, Inc. Howard A. Topel, Washington, D.C., also entered an appearance for Fidelity Television, Inc.

Before TAMM, WILKEY and STARR, Circuit Judges.

STARR, Circuit Judge.

City of Angels Broadcasting, Inc. appeals from a Federal Communications Commission order denying its motion to intervene in a proceeding to determine the recipient of a Los Angeles television station license. We have jurisdiction pursuant to 47 U.S.C. § 402(b). For the reasons which follow, we

hold that it was within the Commission's discretion to deny appellant's admittedly untimely request to intervene in an ongoing comparative proceeding.

## I

This appeal is the latest chapter in a continuing drama at this court and the Federal Communications Commission (FCC or Commission) involving the efforts of RKO General, Inc. (RKO) to retain its television and radio licenses against various charges of wrongdoing levelled against it and its parent, the General Tire & Rubber Company (General Tire). The only question presently before us is whether the FCC acted arbitrarily in denying appellant City of Angels Broadcasting, Inc. (City of Angels) leave to intervene in an ongoing comparative license renewal proceeding with respect to a Los Angeles television license currently held by RKO. An analysis of this straightforward question, however, requires an understanding of the protracted history leading up to the present appeal.

Our story begins two decades ago. In 1965, RKO petitioned the FCC to renew its license for Channel 9, Station KHJ–TV in Los Angeles. A timely application for a construction permit for a new television station on Channel 9 was subsequently filed by Fidelity Television, Inc. (Fidelity). At that early juncture, City of Angels was nowhere to be found. Confronted with these two competing applications, the Commission scheduled a comparative hearing to resolve RKO's renewal application and Fidelity's mutually-exclusive application for a construction permit. After adducing evidence, a Hearing Examiner issued an order in 1969 granting Fidelity's construction permit application and denying RKO's application for renewal. *RKO General, Inc. (KHJ–TV)*, 44 F.C.C.2d 149 (Initial Decision 1969).

While RKO was appealing this adverse decision to the full Commission, across the

country another RKO license was under siege. In that proceeding, competing applicants were challenging RKO's license renewal for Channel 7, WNAC–TV in Boston. *See RKO General, Inc. (WNAC–TV)*, 20 F.C.C.2d 846 (1969). In the Boston proceeding, issues were designated for hearing with respect to anticompetitive practices allegedly engaged in by RKO and its parent company, General Tire, whereby General Tire would condition its purchases of products or materials upon an agreement that the suppliers would purchase advertising time on RKO stations. *See RKO General, Inc. (WNAC–TV)*, 78 F.C.C.2d 1, 38–47 (1980). Known as reciprocal trade dealings, those practices had been raised in the Los Angeles proceeding, although not as broadly as they were subsequently presented in the Boston proceeding.[1] Accordingly, the Commission's Broadcast Bureau asked the Commission to reopen the Los Angeles hearing for consideration of new evidence being developed in Boston on the reciprocity issue, as well as for consideration of an additional RKO fitness issue concerning the candor of certain witnesses who testified in the original hearing with respect to the alleged reciprocal trade practices.

In an order designed to streamline consideration of RKO's challenge to the Hearing Examiner's decision, the Commission declined to reopen the Los Angeles proceeding. *RKO General, Inc. (KHJ–TV)*, 31 F.C.C.2d 70 (1971). Instead, the Commission made Fidelity a party to the Boston proceeding, in which evidence as to RKO's fitness was to be adduced. *Id.* at 74. Such a procedure, according to the Commission, would adequately protect Fidelity's right to adduce new evidence bearing upon RKO's fitness in the event the Commission reversed the Hearing Examiner's decision in favor of Fidelity and found RKO comparatively superior. *Id.* If, on the other hand, the Commission affirmed the Hearing Examiner's decision, any evidence adduced

---

1. The Los Angeles Hearing Examiner received evidence on the reciprocity issue only insofar as it bore relevance to RKO's stewardship of KHJ–TV in Los Angeles. *See RKO General, Inc.*, 44 F.C.C.2d 149, 152 (Initial Decision 1969).

against RKO in Boston would necessarily become immaterial to the Los Angeles proceeding. *Id.*

After some prodding by this court, *see Fidelity Television, Inc. v. FCC,* 502 F.2d 443, 446–47 (D.C.Cir.1974) (detailing actions taken by this court during 1973 in response to Fidelity's petition for writ of mandamus to compel allegedly unreasonably delayed agency action), the FCC in late 1973 issued a decision in RKO's Los Angeles appeal. *RKO General, Inc. (KHJ–TV),* 44 F.C.C.2d 123 (1973). .Reversing the Hearing Examiner's conclusion in favor of Fidelity, the Commission held that RKO should have been granted renewal of its license on the basis of the record compiled in the Los Angeles proceeding. In a 3–2 decision that prompted excoriating criticism from the dissenting Commissioners, *see id.* at 140–42 (Commissioner Johnson, dissenting); *id.* at 142–48 (Commissioner Lee, dissenting), the FCC majority found RKO and Fidelity to be similarly qualified and stated that "credit must be given in a comparative renewal proceeding, when the applicants are otherwise equal, for the value to the public in the continuation of the existing service." *Id.* at 137. Recognizing, however, that further character evidence might be adduced against RKO during the Boston proceeding, the Commission left open the possibility that Fidelity might ultimately be entitled to the Los Angeles license. Specifically, the Commission ordered that "the application of RKO ... is DEEMED TO BE GRANTED, and that the application of Fidelity ... IS DEEMED TO BE DENIED, subject to whatever action may be deemed appropriate following resolution of the matters in [the Boston proceeding]." *Id.* at 138.

When Fidelity subsequently appealed from this order, the Commission moved to dismiss the appeal on the ground that its order was merely interlocutory, inasmuch as Fidelity's application had not been finally denied within the meaning of the applicable judicial review provision, 47 U.S.C. § 402(b)(1). This court disagreed. *Fidelity Television, Inc. v. FCC,* 502 F.2d 443 (D.C.Cir.1974). We held that the chal-

lenged order was immediately reviewable inasmuch as it finally approved RKO's renewal application subject to possible defeasance only upon termination of the Boston proceeding. *See id.* at 448–53. When the challenged order was subsequently reviewed on the merits, this court held that the FCC "did not commit reversible error" in renewing RKO's license and denying Fidelity's application for a construction permit. *Fidelity Television, Inc. v. FCC,* 515 F.2d 684, 702 (D.C.Cir.), *cert. denied,* 423 U.S. 926, 96 S.Ct. 271, 46 L.Ed.2d 253 (1975). The court noted, however, that its affirmance was "conditional (as was the Commission's decision) on the ultimate outcome of the [Boston] proceedings." *Id.* at 703 n. 45.

Shortly after the court's affirmance of the FCC's Los Angeles decision, new fitness issues with respect to RKO emerged in the Boston proceeding. The Securities and Exchange Commission (SEC) challenged as violative of the federal securities laws certain undisclosed domestic and overseas conduct engaged in by RKO's parent company, General Tire. The SEC proceeding resulted in the filing of a consent decree on May 10, 1976, requiring General Tire to undergo an operational review by five non-management directors that would culminate in the issuance of a Special Report. This report, released on July 1, 1977, bore obvious relevance to the FCC proceedings inasmuch as the report admitted wide-ranging corporate misconduct. The Special Report concluded that deficient recordkeeping and accounting practices had caused inaccuracies in RKO financial disclosures filed with the FCC. In 1978, before the FCC could act upon the information contained in General Tire's Special Report, RKO and the two competing applicants for the Boston television license proposed a settlement whereby RKO would assign the license to a new entity to be created by the merger of the two other applicants.

This proposed settlement, which was expressly made contingent upon an FCC finding that RKO was qualified to be a broadcast licensee, obviously had dramatic rami-

fications for the future of the Boston case as a *contested* proceeding. It was thus crucial for Fidelity, as well as for another RKO competitor, Multi-State Communications, Inc. (an applicant for a television license held by RKO in New York which had also been made a party to the Boston proceeding), to have its participatory rights in the Boston proceeding broadly construed. On the other hand, it was to the benefit of RKO and the formerly competing Boston applicants for such rights to be narrowly interpreted. These latter parties accordingly argued that the original FCC order allowing Fidelity to participate in the Boston proceeding was limited to the issue of anticompetitive reciprocal practices engaged in by RKO and General Tire. Rejecting this argument, the FCC ordered that Fidelity (and Multi-State Communications, Inc.) be allowed to participate on *all* issues bearing upon RKO's fitness to be a broadcast licensee. The Commission subsequently explained that:

> Both Fidelity and Multi-State have a clear, substantial interest in the outcome of the Boston proceeding.... [T]he same reasoning which led the Commission to allow Fidelity and Multi-State to participate as to [the reciprocity and related] issues applies to the matters under consideration as a result of the SEC investigation, since these matters also bear upon RKO's basic qualifications. Moreover, it is quite clear that a Commission determination that RKO is qualified in all respects to be a Commission licensee—a determination requested by the [Boston] parties—would have a significant impact on the Los Angeles and New York proceedings. Hence, fairness requires that Fidelity and Multi-State have an opportunity to participate in the Boston case to the extent it concerns RKO's qualifications.

*RKO General, Inc. (WNAC–TV)*, 78 F.C.C.2d 1, 24 (1980).

On the merits, the Commission found that RKO was unfit to be a licensee of the Boston television station. *RKO General, Inc. (WNAC–TV)*, 78 F.C.C.2d 1 (1980). The Commission finding was based upon three independent grounds: (1) RKO's reciprocal trade practices; (2) RKO's inaccurate financial reports; and (3) RKO's lack of candor during the Boston proceeding.[2] In a companion decision, the FCC held that these three factors also disqualified RKO as a licensee of Channel 9 in Los Angeles. The Commission thereupon ordered further pleadings on whether the application of Fidelity, as RKO's sole competitor in the licensing proceeding, could thus be granted. *RKO General, Inc. (KHJ–TV)*, 78 F.C.C.2d 355 (1980). *See also RKO General, Inc. (WOR–TV)*, 78 F.C.C.2d 357 (1980) (disqualifying RKO, on basis of the above three factors, as licensee of the New York television station).

RKO challenged these qualification orders in separate appeals that were then consolidated by this court. *RKO General, Inc. v. FCC*, 670 F.2d 215 (D.C.Cir.1981), *cert. denied*, 456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 442 and 457 U.S. 1119, 102 S.Ct. 2931, 73 L.Ed.2d 1331 (1982). We rejected two of the three disqualifying factors proffered by the FCC, holding that neither the reciprocal conduct, *id.* at 222–25, nor the financial misrepresentations, *id.* at 225–26, could on the record before us support RKO's disqualification. On the other hand, the court did uphold the Commission's reliance upon RKO's lack of candor (*i.e.*, nondisclosure of material facts) during the Boston proceeding as a basis for disqualifying RKO from holding the license for Boston's Channel 7. *Id.* at 228–36. While noting that "it may well be that such a finding [*i.e.*, lack of candor] is inconsistent with a licensee holding a license anywhere," *id.* at 237, we stressed that RKO's lack of candor in the Boston proceeding could not automatically justify revocation

---

2. Although the Commission also based its finding upon certain nonbroadcast misconduct engaged in by RKO's parent company, we did not construe the FCC's opinion as relying upon this element as an independent disqualifying factor.

*RKO General, Inc. v. FCC*, 670 F.2d 215, 222, 226–27 (D.C.Cir.1981), *cert. denied*, 456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 442 and 457 U.S. 1119, 102 S.Ct. 2931, 73 L.Ed.2d 1331 (1982).

of its Los Angeles or New York City licenses. *Id.* at 236–37. Instead, we directed that further proceedings be undertaken with respect to those two licenses so as to allow RKO an opportunity to demonstrate (e.g., by presenting evidence of meritorious programming) why its performance in Los Angeles and New York City merited different treatment. *Id.* at 237. Accordingly, the Boston decision was affirmed, while the Los Angeles and New York City cases were remanded for further proceedings.[3]

While these events were unfolding, City of Angels and another company had in the meantime filed separate petitions with the FCC in June 1980 seeking to intervene in the Los Angeles proceeding after the Commission attempted to disqualify RKO as a Los Angeles licensee. In its June 1983 order that is the subject of this appeal, the Commission denied these intervention requests. *RKO General, Inc. (KHJ–TV),* 54 Rad.Reg.2d (P & F) 53 (1983). We now affirm.

## II

### A

City of Angels' appeal from the FCC's denial of its petition to intervene is predicated upon the assumption that the Los Angeles proceeding remains a live ongoing proceeding. RKO challenges this assumption, however, arguing ingeniously that the proceeding in fact came to an end in 1981 when this court held that RKO could not be denied a broadcast license based upon reciprocal trade practices engaged in during the early 1960s. In RKO's theory of the case, the sole condition contained in the Commission's grant of its license renewal in the face of Fidelity's challenge was based upon the reciprocity issue; once this issue was resolved favorably to RKO, the argument goes, the proceeding automatically terminated. Fidelity's sole lingering hope to defeat RKO's license was, in RKO's view, thereby extinguished.

None of the other parties before the court accepts RKO's creative characterization of the FCC's proceedings. Quite to the contrary, both the Commission and Fidelity argue vigorously that the Los Angeles proceeding will not be over until all fitness issues raised against RKO in the Boston proceeding have been resolved. Inasmuch as the effect of RKO's lack of candor in the Boston proceeding upon its Los Angeles license is yet to be determined, these parties maintain that the Los Angeles proceeding is still alive and well.

In support of their respective arguments, the contending sides are able to find comfort in the language of the manifold judicial and administrative opinions that the RKO licensing saga has spawned. *Compare Fidelity Television, Inc. v. FCC,* 515 F.2d 684, 703 n. 45 (D.C.Cir.1975) (broadly conditioning affirmance "on the ultimate outcome of the [Boston] proceedings"), *cert. denied,* 423 U.S. 926, 96 S.Ct. 271, 46 L.Ed.2d 253 (1975) *and RKO General, Inc. (KHJ–TV),* 44 F.C.C.2d 123, 138 (1973) (grant of channel 9 license to RKO made "subject to whatever action may be deemed appropriate following resolution of the matters" in the Boston proceeding) *with Fidelity Television, Inc. v. FCC,* 502 F.2d 443, 452 (D.C.Cir.1974) ("[I]n the event the court affirms the Commission and no decisive evidence of anticompetitive activity on the part of RKO is developed in the Boston proceeding, RKO preserves its [Los Angeles] license") *and RKO General, Inc. (KHJ–TV),* 31 F.C.C.2d 70, 74 (1971) (limiting Fidelity's Boston "participation to matters pertaining to RKO's character qualifications to be a Commission licensee either by reason of antitrust or anticompetitive activities or by reason of the alleged conduct which forms the basis for the [candor] issues added by the Review Board").

The imprecision which with the benefit of hindsight we can discern in the various opinions is entirely understandable. At

---

**3.** RKO was subsequently able to avoid these further proceedings in New York yet retain its license by taking advantage of newly-enacted legislation that granted it an automatic five-year license in return for relocating its station to New Jersey. *See Multi-State Communications, Inc. v. FCC,* 728 F.2d 1519 (D.C.Cir.1984).

that time no one, of course, could peer into the future and foresee that the Boston proceeding would significantly expand beyond the reciprocity and related issues. *See RKO General, Inc. v. FCC, supra,* 670 F.2d at 236 ("The FCC could not have known, when it conditioned [the Los Angeles proceeding] as it did, that the Boston outcome would turn on a lack of candor issue that had not even been designated in the Boston proceeding."). It would therefore be disingenuous now to attribute to isolated quotations from these opinions a meaning they were never intended to bear.

■ In our view, the better approach is to acknowledge that these opinions did not address the extent of Fidelity's participatory rights beyond the reciprocity-related issues and then to ask whether the FCC order conditioning the renewal of RKO's Channel 9 license (as well as the denial of Fidelity's construction permit) upon the outcome of the Boston proceeding was sufficiently broad to accommodate Fidelity's participation as to subsequently arising issues bearing upon RKO's fitness as a broadcast licensee. The FCC has, of course, consistently answered this question in the affirmative. Our review, in turn, of the Commission's construction of its own prior order is narrow: we may not overturn it unless there are compelling indications that it is wrong. *See Brotherhood of Railway and Airline Clerks, Consolidated System Board of Adjustment 46 v. Burlington Northern Inc.,* 671 F.2d 1085, 1088 (8th Cir.1982); *cf. Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969); *Udall v.*

*Tallman,* 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616 (1965) ("The Secretary's interpretation may not be the only one permitted by the language of the orders, but it is quite clearly a reasonable interpretation; courts must therefore respect it.") (citations omitted); *Tele-Media Corp. v. FCC,* 697 F.2d 402, 420 (D.C.Cir.1983). We are, under the circumstances before us, quite unable to hold that the Commission was unreasonable in interpreting its 1973 order in the fashion it did.[4]

Our deference to the agency's reading of its own orders is buttressed in this instance by the specific action taken by this court in 1981 when it remanded the Los Angeles case to the Commission for further proceedings. *See RKO v. FCC, supra,* 670 F.2d at 236–37. Despite our holding that reciprocal conduct would not support RKO's disqualification as a broadcast licensee, *see id.* at 222–25, this court remanded the Los Angeles case to the FCC "for further consideration as it deems appropriate." *Id.* at 236. Furthermore, although the orders in which the FCC had rejected RKO's attempt to limit Fidelity's participation to reciprocity-related issues were among those under review, the court made no mention of any disagreement whatever with the FCC's decision in this respect. On the contrary, the court suggested that RKO's lack of candor in the Boston proceeding might well be a sufficient basis for stripping its Los Angeles license. *See id.* at 237. We therefore reject RKO's argument that the terms of the Commission's 1973 order dictate the conclusion that the RKO/Fidelity comparative proceeding is an irrevocably closed chapter.[5]

4. It should be noted that the relevant order in this determination is the *FCC* order conditionally granting RKO's application while conditionally denying Fidelity's application. This court's subsequent affirmance of the order did not purport to in any way modify it; instead, we simply adopted the FCC order. *See Fidelity v. FCC, supra,* 515 F.2d at 703 n. 45.

5. The fulcrum of the dissent's position is that the comparative hearing between RKO and Fidelity "was closed off in 1973 by the action of the FCC" in a *conditional* order which this court affirmed in 1975. In the dissent's view, from that juncture "the Commission could entertain

challenges to the license-holder of channel nine only in new proceedings." *Infra* at 669. From the manifold events which unfolded in the Byzantine history of this proceeding, the dissent perceives the death knell for the RKO-Fidelity struggle in this court's decision in 1974. *Fidelity Television, Inc. v. Federal Communications Comm'n,* 502 F.2d 443, 449–52 (D.C.Cir.1974) (per curiam).

We could not be more fully agreeable to the salutary principle that a prior decision of this court is fully binding on us. Our disagreement with our dissenting colleague is in no wise occasioned by disaffection with that bedrock rule;

## III

### A

City of Angels' request to join this ongoing proceeding, although nominally styled a petition to intervene, seeks in essence to have the FCC consider the merits of its application for a construction permit for a television station that would operate on Channel 9 in Los Angeles. Accordingly, the parties have correctly identified the

issue as whether the FCC committed reversible error when it refused to waive an administrative "cut-off" rule. That rule quite sensibly prescribes a date after which construction permit applicants which are mutually exclusive with previously-filed license renewal applications will generally not be accepted. *See* 47 C.F.R. § 73.-3516(e) (current version).[6] Resolution of this issue requires an understanding of the purposes served by the cut-off rule, as well

---

to the contrary, we embrace it and depart from the dissent only in the more modest respect of applying that venerable principle to the facts before us. In our view, this court's 1974 decision in *Fidelity Television* did not even purport to decide once and for all the rights of RKO and Fidelity with respect to the Los Angeles comparative proceeding. The court went to some lengths to demonstrate that the Commission's December 6, 1973 order was reviewable, by virtue of, *inter alia,* its effects upon Fidelity *during the pendency of the Boston proceeding.* Fidelity was, the court found, affected by and would ·continue to be affected by the December 1973 order since the on-going Boston proceeding would· not likely "terminate in the near future." 502 F.2d at 451. This was by no means thought to be the end of the RKO-Fidelity epic, however, and this court frankly recognized that fact: "[T]he effect of the 6 December order will be felt in a concrete way for quite some time." *Id.* "Quite some time" is a far cry from the eternal demise of the Los Angeles comparative proceeding now perceived by the dissent. Indeed, our brethren in 1974 went on in language that we find convincingly clear:

> The 6 December order may not be the very last order issued by the Commission in the Los Angeles proceeding if RKO ultimately loses its license from KHJ–TV as a result of the Boston proceeding.

*Id.* This proved prophetically accurate, as we have already seen. The December 6, 1973 order simply did not relegate the Fidelity-RKO struggle to the historical annals of the television broadcasting industry. To us, rather, the conclusion is inescapable that "the Los Angeles proceeding," which this court addressed in 1974, was still alive, pending the conclusion of the Boston proceeding.

Our conclusion here thus simply cannot reasonably be read as doing violence to the handiwork of our brethren a decade ago and resurrecting Phoenix-like the Los Angeles proceeding from ashes purportedly created by this court's 1974 decision.

.And the dissent doubtless perceives the weakness of its revisionist reading of our 1974 decision by promptly moving to the higher ground of policy and logic underlying the Commission's cut-off rule. From there, the dissent launches a barrage against application of the cut-off rule

based upon the polestar of the public interest. Suffice it to say, as we suggest more fully in the text, that the appropriate province of judicial review is not to overturn agency action which is permitted by and consistent with its own rules simply by virtue of policy concerns within the judiciary over perceived Pharisaic attitudes afflicting the agency in the enforcement of its own rules.

6. The current version of the cut-off rule provides:

> § 73.3516   Specification of facilities.
>
> \*  \*  \*  \*  \*  \*
>
> (e) An application for a construction permit for a new broadcast station or for modification of construction permit or license of a previously authorized broadcast station will not be accepted for filing if it is mutually exclusive with an application for renewal of license of an existing broadcast station unless it is tendered for filing by the end of the first day of the last full calendar month of the expiring license term.
>
> (1) If the license renewal application is not timely filed as prescribed in § 73.3539, the deadline for filing applications mutually exclusive therewith is the 90th day after the FCC gives public notice that it has accepted the late-filed renewal application for filing.
>
> (2) If any deadline falls on a nonbusiness day, the cutoff shall be the close of business of the first full business day thereafter.
>
> (3) The dates when the licenses of all broadcast and broadcast auxiliary services regularly expire are listed in §§ 73.733, 73.-1020 and 74.15.

47 C.F.R. § 73.3516(e). It is conceded that City of Angels' application for a construction permit was untimely. The Commission, in a statement that no party disputes, asserts that "[u]nder the rules in effect at the time RKO and Fidelity filed their applications, other competing applications could have been filed until June 7, 1966, the day before the Commission designated the RKO and Fidelity application for hearing." Brief for Appellee at 20 n. 20. Thus, City of Angels, which filed its first pleading with the Commission on June 13, 1980, missed the deadline by more than fourteen years.

as an understanding of this court's role in reviewing an agency's refusal to waive one of its own regulations.

The FCC's cut-off rule was prompted by the watershed decision in *Ashbacker Radio Corp. v. FCC*, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), requiring the Commission to conduct a comparative hearing whenever mutually exclusive broadcast applications have been filed. *See also* 47 U.S.C. § 309(e) (statutory codification of the *Ashbacker* "full hearing" requirement). Intended to fill a void identified by the Supreme Court in *Ashbacker, see* 326 U.S. at 333 n. 9, 66 S.Ct. at 151 n. 9, the rule has consistently been approved by this court as a valid means by which the FCC may carry out its mandate of affording a comparative hearing to mutually exclusive broadcast applicants. *See, e.g., Committee for Open Media v. FCC*, 543 F.2d 861, 873 (D.C.Cir. 1976); *Radio Athens, Inc. (WATH) v. FCC*, 401 F.2d 398, 400–01 (D.C.Cir.1968); *Century Broadcasting Corp. v. FCC*, 310 F.2d 864, 866 (D.C.Cir.1962); *Ranger v. FCC*, 294 F.2d 240, 243 (D.C.Cir.1961).

The cut-off rule basically serves two purposes. First, it advances the interest of administrative finality: "There must be some point in time when the Commission can close the door to new parties to a competitive hearing or, at least hypothetically, no licenses could ever be granted." *Radio Athens, supra,* 401 F.2d at 401. Second, it aids timely broadcast applicants by granting them a "protected status," *see Ranger, supra,* 294 F.2d at 243, that allows them to prepare for what often will be an expensive and time-consuming contest, fully aware of the competitors they will be facing. *See, e.g., Bronco Broadcasting Co.,* 50 F.C.C.2d 529, 533–34 (1974); *Howard University,* 23 F.C.C.2d 714, 716 (1970).[7]

In the present case, the FCC determined that these dual purposes would be thwart-ed by waiving the cut-off rule so as to allow City of Angels to file its construction permit application fourteen years late. The scope of our review of this determination is narrow and contained. *See generally* 5 U.S.C. § 706(2)(A). As we recently had occasion to note, "[a]n applicant for a waiver not only bears the burden of convincing the agency that it should depart from the rules, but on judicial appeal, the applicant must show that the agency's reasonings for declining the waiver were 'so insubstantial as to render that denial an abuse of discretion.'" *Thomas Radio Co. v. FCC*, 716 F.2d 921, 924 (D.C.Cir.1983); *see also ICBC Corp. v. FCC*, 716 F.2d 926, 929 (D.C.Cir.1983) *WAIT Radio v. FCC*, 459 F.2d 1203, 1207 (D.C.Cir.) (" 'An applicant for waiver faces a high hurdle even at the starting gate.' On ... appeal to this court, the burden ... is even heavier."), *cert. denied,* 409 U.S. 1027, 93 S.Ct. 461, 34 L.Ed.2d 321 (1972) (citation omitted). We are quite unable to say that the Commission abused its discretion, or otherwise acted arbitrarily, when it refused to waive its cut-off rule.

In refusing City of Angels' waiver request (as well as the request of another untimely applicant), the Commission correctly noted that the cut-off rule is "designed to permit [it] to close the door to new parties so that a choice can be made between timely filed applicants, thereby giving timely filed applicants protection against opportunistic late-comers." *RKO General, Inc. (KHJ-TV)*, 54 Rad.Reg.2d (P & F) 53, 58–59 (1983) (footnotes omitted). The FCC concluded that there were "no unusual and compelling circumstances warranting waiver of this rule." *Id.*

This conclusion was well within the Commission's broad discretion. This proceeding has now been before the agency and the courts for almost twenty years. It

---

7. We obviously do not mean to suggest that the cut-off rule gives timely applicants a vested right against challenge from untimely competitors. *See, e.g., Denton Channel Two Foundation, Inc.,* 85 F.C.C.2d 983 (1981) (waiver granted noncommercial educational applicant who filed application three months late). It is, however, manifestly within the Commission's discretion to consider the effects that acceptance of an overdue filing would have upon timely applicants.

defies reason to suggest that the Commission abused its discretion by concluding that to permit at this late date new competitors for the Channel 9 license would thwart the vital goal of bringing about a fair and final resolution of this long and drawn-out controversy.[8] Furthermore, the Commission's reference to "opportunistic late-comers" indicates that the agency was concerned that granting waivers would contravene the protected status of Fidelity, which for almost twenty years has expended the substantial time and resources necessary to wage this unfortunately protracted battle. For these reasons we reject City of Angels' contention that the Commission abused its discretion in refusing to grant a belated intervention application.[9]

**B**

City of Angels mounts two additional arguments that, carried to their logical conclusion, go beyond a challenge to the denial of an intervention petition. First, it argues that the record in this case is so stale that the proceeding must be reopened. Second, it argues that this court's decision in *New South Media Corp. v. FCC*, 685 F.2d 708 (D.C.Cir.1982), requires that new applicants be allowed to compete for the Channel 9 license. Acceptance of either of these arguments would result in our holding that the RKO/Fidelity comparative proceeding must be terminated in favor of an entirely new proceeding in which any applicant who so desired could compete. This is, of course, the same result championed by RKO. *See supra* Part II. Unlike RKO, which would have us arrive at this destination by holding that the Commission erroneously construed its own prior orders, City of Angels contends that the Commis-

sion is obligated under governing case law to scrap this proceeding and begin anew.

Before examining City of Angels' specific contentions, we set the stage for this branch of our inquiry by observing that the Commission enjoys wide discretion in fashioning its own procedures. Section 4(j) of the Communications Act of 1934, 47 U.S.C. § 154(j), provides in broad fashion that the FCC "may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice." In *FCC v. Schreiber*, 381 U.S. 279, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965), the Supreme Court stated that this provision indicates that "Congress has left largely to [the Commission's] judgment the determination of the manner of conducting its business which would most fairly and reasonably accommodate the proper dispatch of its business and the ends of justice." *Id.* at 289, 85 S.Ct. at 1467 (internal quotation omitted). The Court further noted that this congressional delegation of authority to the FCC encompassed the "power to resolve subordinate questions of procedure such as the scope of the inquiry, whether applications should be heard contemporaneously or successively, whether parties should be allowed to intervene in one another's proceedings, and similar questions." *Id.* (internal quotation and punctuation omitted). In like manner, we have consistently recognized that the FCC is vested with broad discretion in structuring its own proceedings. *See, e.g., MCI Telecommunications Corp. v. FCC*, 712 F.2d 517, 533 (D.C.Cir.1983); *Western Union Telegraph Co. v. FCC*, 665 F.2d 1112, 1121 & n. 13 (D.C.Cir.1981); *Nader v. FCC*, 520 F.2d 182, 195–97 (D.C.Cir.1975). For the following reasons, we are firmly persuaded that the arguments advanced by

---

8. We have previously noted that delay in these proceedings works to RKO's benefit by allowing it to retain its licenses during the interim period. *See New South Media Corp. v. FCC*, 685 F.2d 708, 712, 715–17 (D.C.Cir.1982); *see generally* 47 U.S.C. § 307(d) ("Pending any hearing and final decision on [a license renewal] application ..., the Commission shall continue such license in effect.").

9. There is no "artificial" limitation here, as the dissent would have it, *infra* at 668, on the pool of competing candidates. The limitation derives, rather, from the application of Commission rules of long standing, nothing more, nothing less. We can divine no artifice employed by the Commission to limit the contenders to the two applicants who were beyond cavil the only timely applicants for the license in question.

City of Angels fall short of overcoming the presumption that the FCC, rather than this court, should determine how best to structure comparative hearings in furtherance of the public interest.

City of Angels' first argument is that both Fidelity [10] and the Los Angeles area served by Channel 9 have undergone dramatic changes since the inception of this proceeding such that the record compiled by the FCC is now stale. There can be no doubt, as the dissent argues, that significant changes have swept over Los Angeles County during the past twenty years. The staleness argument in this case, however, is severely undercut by the fact that the record has been updated in accordance with 47 C.F.R. § 1.65. That rule requires that applications be updated to reflect any substantial changes that may be of decisional significance.[11] We further note that an extremely heavy burden looms before a party seeking to overturn a final administrative order on grounds of staleness. *See, e.g., Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 294–296, 95 S.Ct. 438, 446–447, 42 L.Ed.2d 447 (1974). The contention advanced by petitioner, and embraced by the dissent, is even more dramatic. City of Angels asks us to hold, *in advance of a final administrative determination* with respect to the license for Channel 9, that the record will inevitably be too stale to support an award to either RKO or Fidelity. City of Angels has not shown, even assuming that such a showing could ever be made,[12] that the FCC in the present case

**10.** City of Angels points out that shifts have occurred among Fidelity's management and shareholders since the inception of this proceeding. In its opening brief, appellant appeared to assert that these shifts constituted a transfer of control within the meaning of 47 C.F.R. § 73.-3572(b), and thereby deprived Fidelity of its cut-off rights. Brief for Appellant at 16–17. Fidelity disputed this interpretation of the regulation, arguing that a transfer of control within the meaning of the regulation "occurs only when control of an applicant passes to persons whose qualifications have not been previously disclosed to and reviewed by the Commission." Brief for Intervenor Fidelity at 25 (citations omitted). In its reply brief, City of Angels clarified that "[t]he point is not ... that an unauthorized transfer of control has occurred requiring that Fidelity suddenly be thrust to the end of the processing line, but rather that the Fidelity before this court today is not the Fidelity that filed an application for Channel 9 in 1965." Reply Brief for Appellant at 5. We therefore do not interpret City of Angels' argument to be that the Commission erroneously failed to invoke 47 C.F.R. § 73.3572(b).

**11.** It is thus entirely unnecessary to throw up our hands and despairingly conclude, as the dissent seemingly does, that epochal changes in Los Angeles cannot be taken into account by the Commission at this juncture. The record here is not frozen. We assume that the Commission reads the weekly news magazines as well, and will not be blind in the days to come to population growth and demographic changes in Los Angeles. We are not aware of any Commission principle to the effect that the more things change, the more they remain the same. And we simply will not presume in advance that the Commission is either unwilling or incapable of

having a developed, up-to-date record on which ultimately to act in bringing this proceeding promptly to a close.

**12.** The cases cited by City of Angels in which this court has required an ongoing FCC proceeding to give way to a new proceeding opened to additional applicants uniformly involved some circumstance, generally the presence of *ex parte* contacts, that cast doubt upon the integrity of the Commission's proceedings. For example, our decision in *Sangamon Valley Television Corp. ("SVTC") v. United States,* 294 F.2d 742 (D.C.Cir.1961), *after remand sub nom. Fort Harrison Telecasting Corp. v. FCC,* 324 F.2d 379 (D.C.Cir.1963), *cert. denied sub nom. SVTC v. United States,* 376 U.S. 915, 84 S.Ct. 665, 11 L.Ed.2d 611 (1964), concerned the same *ex parte* contacts that had originally led the Supreme Court to vacate and remand the case to this court for further proceedings. *See SVTC v. United States,* 358 U.S. 49, 79 S.Ct. 94, 3 L.Ed.2d 47 (1958) (per curiam), *on remand,* 269 F.2d 221 (D.C.Cir.1959). In our 1961 decision, we decided that the same "basic fairness" that prohibits *ex parte* contacts required, given all the circumstances, a fresh start in what had been a tainted proceeding. *See* 294 F.2d at 743. Similarly, our decision in *WORZ, Inc. v. FCC,* 345 F.2d 85 (D.C.Cir.), *cert. denied,* 382 U.S. 893, 86 S.Ct. 180, 15 L.Ed.2d 150 (1965), was an outgrowth of the Supreme Court's vacation and remand on an earlier decision in the same proceeding for consideration of *ex parte* contacts. *See WORZ, Inc. v. FCC,* 358 U.S. 55, 79 S.Ct. 114, 3 L.Ed.2d 48 (1958). In requiring that new applications be considered, we noted that "th[e] case had been beset throughout by a variety of dubious circumstances...." 345 F.2d at 86.

We fully recognize that some of our opinions in these cases contain language expressing con-

will be unable to compile a record sufficiently fresh to withstand a staleness attack.

City of Angels' final argument is that the Commission's decision to continue the RKO/Fidelity proceeding rather than begin an entirely new proceeding is inconsistent with this court's decision in *New South Media Corp. v. FCC, supra.* We held in *New South Media* that it was unreasonable for the FCC not to accept competing applications for certain RKO radio and television licenses that had been conditionally renewed, subject to noncomparative hearings that were deferred for periods ultimately extending well beyond the applicable three-year license renewal period. In mandating Commission acceptance of competing applications for these licenses, we relied heavily upon the well-established principle that the public interest is best served by comparative hearings to determine broadcast license awards. *See id.* at 714–15. We held that the Commission "ha[d] not adequately accounted for an action destined to prolong by months and in some cases even years licensee RKO's immunity from competitive challenge and comparative evaluation." *Id.* at 715. In so holding, however, the court was careful to distinguish the situation before it from situations in which would-be competitors "tried to intrude" in an ongoing proceeding

that had extended beyond what would normally have been the expiration date of the license term at issue. *See id.* at 715–16 (distinguishing *Committee for Open Media v. FCC,* 543 F.2d 861 (D.C.Cir.1976)).[13]

In light of the fact that concern for competition formed the basis for this court's decision in *New South Media,* City of Angels' reliance upon that case is misplaced. RKO and Fidelity have been, and continue to be, engaged in the type of "license competition that normally propels a licensee to better broadcasting." *Cf. Committee for Open Media, supra,* 543 F.2d at 873 (quoted in *New South Media, supra,* 685 F.2d at 716). Indeed, City of Angels argues at one point that a continuation of the RKO/Fidelity comparative proceeding would "effectively shield *Fidelity* from needed competition...." Brief for Appellant at 13 (emphasis supplied). The defect in the FCC proceeding identified by this court in *New South Media* was, of course, precisely the opposite. There, an incumbent licensee (RKO) was the party found to have been improperly shielded from competition. We are unmoved by City of Angels' claim, which appears dubious in any event, that a construction permit applicant (Fidelity) is not receiving ample competition from an incumbent licensee (RKO). *Cf. New South Media, supra,* 685 F.2d at 715 ("[T]he court has attempted to close review of Commis-

---

cern with the length of the proceedings. *See, e.g., id.* (dubious circumstances "have prolonged the ultimate choice an unconscionably long period beyond the assembling of the facts upon which that choice must of necessity be based"). It is significant, however, that in no case cited to us did this court hold that the record's potential staleness, standing alone, justified our requiring in advance of the termination of an administrative proceeding that the proceeding begin anew. Given both the extent of our deference to the FCC's structuring of its own proceedings and the Supreme Court's teaching in *Bowman* that a court shall rarely be justified in overturning an administrative decision on staleness grounds, we have doubts as to whether there could be justification for a court to hold that an *ongoing* FCC proceeding must be terminated because the Commission will be unable to produce a record amply fresh to support its eventual decision.

**13.** The *New South Media* court did not decide the question left open in *Committee for Open Media* —whether a competing applicant may in-

tervene in an ongoing but *non-comparative* license-renewal proceeding that has extended beyond the license term at issue—and neither do we. In *New South Media,* we quoted the *Committee for Open Media* court's distillation of the "conflicting considerations" that would underlie resolution of this question:

> The court observed first that "without a moratorium on competing applications while a renewal hearing progresses, a final resolution on renewal might be severely hampered." [543 F.2d] at 873. On the other hand, the court stated, if the Commission barred competitors during the full-run of protracted renewal proceedings, a station's audience would be deprived "perhaps for a long time, of potential license competition that normally propels a licensee to better broadcasting." *Id.*

685 F.2d at 716. The present case, involving as it does an ongoing *comparative* proceeding, does not implicate this latter concern.

sion policy regarding 'renewal expectancy' to ascertain whether the FCC is according incumbent licensees undue protection to the detriment of the public.") (citing *Central Florida Enterprises, Inc. v. FCC,* 683 F.2d 503 (D.C.Cir.1982), *cert. denied,* 460 U.S. 1084, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983)). In sum, *New South Media* is by its own terms inapposite to a case involving an ongoing comparative proceeding.

### IV

We have examined with care the contentions that this court should mandate termination of the RKO/Fidelity comparative proceedings, and have found them, upon analysis, to be without merit. Obviously, one cannot resist being given to dismay over the sheer length of this proceeding. Nevertheless, we take the case as it comes to us. And it is our considered view that, given the present posture of the case, it would be inappropriate to order a new proceeding.[14] Notwithstanding City of Angels' vigorous protestations to the contrary, the inevitable result of opening his proceeding to all comers would be yet further delay in determining who should be the licensee of Channel 9 in Los Angeles. This we decline to do.

The decision under review is therefore

*Affirmed.*

WILKEY, Circuit Judge, dissenting.

The majority denies City of Angels's motion to intervene and petition to reopen proceedings. It holds that a proceeding to award a television broadcast license—valid for five years—is still "open" after nearly twenty years, in contravention of an earlier decision of this court and at cross-purposes

with the logic underlying the Federal Communications Commission's (FCC's) cutoff rule, the objective of limited-period licensing, and the need to ground licensing decisions on current data in order to reach informed decisions. The effect of the majority's decision is to limit competition for channel nine (KHJ–TV) in Los Angeles to what this court has described as two "equally poor contenders."[1] For these reasons, the majority errs in affirming the Commission's denial of City of Angels's motion to intervene and petition to reopen; I must respectfully but firmly dissent.

### I. Facts

Let us emphasize at the outset that I do not condone any action that would perpetuate RKO's status as licensee of channel nine in Los Angeles. The charges leveled at RKO—including, but not limited to, illegal foreign payments by its parent company, the General Tire and Rubber Company, illegal tie-ins between sales of the parent's goods and advertising on RKO, and lack of candor before the Commission—are grave. As one commentator reviewing this case observed, "Agencies rarely are confronted with [such] a large body of admissions capable of being interpreted as a confession of misconduct."[2] Dissenting from a Commission order (on a three to two vote) renewing RKO's operating license, Commissioner Johnson stated that the "decision, granting RKO's renewal application for KHJ–TV in Los Angeles, may very well be the worst decision of this Commission during my term of seven years and five months."[3] Judge Bazelon agreed, adding

---

**14.** The dissent's suggestion that the result here is guided by the "desire to put RKO out of the broadcasting business in Los Angeles," *infra* at 668, misperceives our role in the review of agency action. Our task, limited but important, is a straightforward one—to determine whether the Commission erred in refusing City of Angels' motion to intervene in this proceeding. It is not our mission to seek to put RKO or any other entity out of the broadcasting business in Los Angeles or anywhere else.

1. *Fidelity Television, Inc. v. Federal Communications Comm'n,* 515 F.2d 684, 702 (D.C.Cir.), *cert. denied,* 423 U.S. 926, 96 S.Ct. 271, 46 L.Ed.2d 253 (1975).

2. Tollin, *The RKO Case: Unique Facts with Extraordinary Consequences,* 35 Fed.Com.L.J. 275, 311 (1983).

3. *RKO General, Inc. (KHJ–TV),* 44 F.C.C.2d 123, 140 (1973) (Johnson, Comm'r, dissenting).

that "[d]espite the intense competition for this honor, I am constrained to agree."[4]

But our desire to put RKO out of the broadcasting business in Los Angeles should not blind us to the fact that, as playwrights Beaumont and Fletcher put it, "the medicine [may be] worse than the malady." Federal law requires that television licenses be awarded only after comparative hearings to determine the best qualified licensee.[5] The purpose of comparative hearings is ill-served when the pool of candidates is artificially limited to two "equally poor contenders."[6] The alleged improprieties of the incumbent license-holder, RKO, have already been hinted at. But the challenger, Fidelity Television, Inc., did not look much better to the hearing examiner, who concluded that "Fidelity look[ed] bad" from the standpoint of the integration of ownership and management criterion and, along with RKO, was no "bargain as a broadcast licensee."[7] To take a specific instance, Fidelity proposed that two of its shareholders—who were to work only part time and neither of whom had broadcast experience—supervise a paid broadcast staff. The hearing examiner characterized this suggestion as being either "witless[ ]" or insincere.[8]

While RKO and Fidelity were competing for the distinction of being the least qualified applicant for channel nine, the ostensible guardian of the public interest, the Federal Communications Commission, was remarkably oblivious to events and to the need for an expeditious resolution of this controversy. This proceeding began in October *1965*. The Commission released the Initial Decision of the hearing examiner nearly four years later, on 13 August 1969,[9] and did not hear oral argument until two years after that, on 12 October 1971.

As of 22 March 1973, the Commission had still not reached a decision, prompting Fidelity to file a petition for a writ of mandamus in this court. Although we refused to issue the writ, we found the Commission's decision to have been unreasonably delayed and ordered it to report its progress within thirty days.[10] The Commission did report its progress (on 6 July), but had still not issued a decision when Fidelity renewed its petition on 21 November 1973.[11] On 6 December 1973, before this court could act, the Commission finally announced its decision.

The Commission reversed the hearing examiner and ordered that "the application of RKO ... IS DEEMED TO BE GRANTED, and that the application of Fidelity ... IS DEEMED TO BE DENIED, subject to whatever action may be deemed appropriate following resolution of the matters in Docket No. 18759 [a license renewal proceeding in Boston]."[12] Two years later,

---

4. *Fidelity Television, Inc. v. Federal Communications Comm'n,* 515 F.2d at 726 (Bazelon, J., dissenting from denial of rehearing en banc).

5. *See* 47 U.S.C. § 309(e) (1982). The comparative hearing requirement originated in the Supreme Court's decision in *Ashbacker Radio Corp. v. Federal Communications Comm'n,* 326 U.S. 327, 333, 66 S.Ct. 148, 151, 90 L.Ed. 108 (1945).

6. *Fidelity Television, Inc. v. Federal Communications Comm'n,* 515 F.2d at 702.

7. *RKO General, Inc. (KHJ–TV),* 44 F.C.C.2d 149, 226–27 (Initial Decision 1969); *accord Fidelity Television, Inc. v. Federal Communications Comm'n,* 515 F.2d at 705 (per curiam) (denying petition for rehearing en banc) ("When the smoke clears away, we are left with the distinct impression that we have a 'nothing' applicant, who has offered a novel construct of a Southland service philosophy; who has an integration

philosophy that the examiner correctly derided as being either 'witless' or insincere; who has shown lack of candor in certain aspects—and who comes before the FCC rather naked...." (footnote omitted)).

8. *RKO General, Inc. (KHJ–TV),* 44 F.C.C.2d at 227.

9. *See id.* at 149.

10. *Fidelity Television, Inc. v. Federal Communications Comm'n,* No. 73–1313 (D.C.Cir. 22 Mar. 1973) (unreported).

11. *See Fidelity Television, Inc. v. Federal Communications Comm'n,* 515 F.2d 684, 692 (D.C. Cir.), *cert. denied,* 423 U.S. 926, 96 S.Ct. 271, 46 L.Ed.2d 253 (1975).

12. *RKO General, Inc. (KHJ–TV),* 44 F.C.C.2d 123, 138 (1973).

this court affirmed, conditional upon the outcome of the Boston proceeding.[13]

Five years after our affirmance, the Commission determined that RKO was not qualified to be licensee of the Boston station and denied its application for renewal.[14] At the same time, it adopted an order in the Los Angeles case finding that RKO lacked the requisite qualifications to remain licensee of KHJ–TV.[15] At that time, City of Angels filed a motion for leave to intervene and a petition to reopen proceedings. The Commission did not even consider the motion and petition until three years had elapsed, and then denied City of Angels's request in a conclusory paragraph.[16] The majority denies this motion today; from its opinion I respectfully dissent.

## II. ANALYSIS

The comparative hearing between RKO and Fidelity was closed off in 1973 by the action of the FCC; the Commission's conditional order was affirmed by this court in 1975. From that point on, the Commission could entertain challenges to the licenseholder of channel nine only in new proceedings. A new proceeding is ipso facto open to new challengers as well as to Fidelity. Because the instant proceeding cannot reasonably be understood as a continuation of the one begun in 1965 and terminated by the Commission's order in 1973, it must therefor be a new proceeding in which City of Angels should be allowed to intervene.

### A. The Commission's 1973 Decision Was Final According to a Prior Decision of this Court

Although the majority is quite right to point out that an agency's construction of its own orders is entitled to substantial deference,[17] an earlier decision of this court construed the FCC's 1973 order conditionally granting RKO's renewal application as final.[18] As we stated in *Fidelity Television, Inc. v. Federal Communications Commission,*

> The principle of finality in administrative law is not, however, governed by the administrative agency's characterization of its action, but rather, by a realistic assessment of the nature and effect of the order sought to be reviewed. Hence, "a final order need not necessarily be the very last order" in an agency proceeding, but rather is final for purposes of judicial review when it "impose[s] an obligation, den[ies] a right, or fix[es] some legal relationship as a consummation of the administrative process." [19]

This authoritative decision by a panel of this circuit merits at least as much deference as that showed by the majority to the Commission in this case.

### 1. The majority's straw man

The majority sets up a straw man when, describing RKO's theory of the case, it refutes the argument that "the sole condition contained in the Commission's grant of its license renewal in the face of Fidelity's challenge was based upon the reciprocity issue; once this issue was resolved favorably to RKO, the argument goes, the proceeding automatically terminated." [20] If this were an accurate depiction of the

---

**13.** *See Fidelity Television, Inc. v. Federal Communications Comm'n,* 515 F.2d at 703 n. 45.

**14.** *See RKO General, Inc. (WNAC–TV),* 78 F.C.C.2d 1, 2–3 (1980), *modified, RKO General, Inc. v. Federal Communications Comm'n,* 670 F.2d 215, 221–38 (D.C.Cir.1981), *cert. denied,* 456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 442 (1982).

**15.** *See RKO General, Inc. (KHJ–TV),* 78 F.C.C.2d 355, 355–56 (1980), *modified, RKO General, Inc. v. Federal Communications Comm'n,* 670 F.2d at 221–38.

**16.** *See RKO General, Inc. (KHJ–TV),* 54 RAD. REG.2D (P & F) 53, 59 (1983).

**17.** *See* Maj.Op. at 661.

**18.** *See Fidelity Television, Inc. v. Federal Communications Comm'n,* 502 F.2d 443, 449–52 (D.C.Cir.1974) (per curiam).

**19.** *Id.* at 448 (footnotes omitted).

**20.** Maj.Op. at 660.

events, the majority would have a point in wondering why this court remanded after holding that anticompetitive conduct—supposedly the sole ground for defeasance of the renewal license conditionally granted RKO—could not support RKO's disqualification as broadcast licensee.[21]

But the condition under which the Commission could strip RKO of its operating license would be removed—and remand rendered inappropriate—only if it pertained solely to anticompetitive conduct. In fact, the Commission's order predicated RKO's continued licensure on successfully surviving the challenge to its *basic qualifications* in the Boston proceeding. The majority acknowledges as much when it states in a footnote that "[t]his court's subsequent affirmance of the [FCC's 1973] order did not purport to in any way modify it; instead, we simply adopted the FCC order."[22] That order made the renewal of RKO's operating license "subject to *whatever action* may be deemed appropriate following resolution of *the matters* [including anticompetitive conduct and any other matters affecting "basic qualifications"] in Docket No. 18759 [a Boston license renewal proceeding]."[23] Likewise, this court's affirmance of the Commission's 1973 order was made "conditional (as was the Commis-

sion's decision) on *the ultimate outcome* of the WNAC [Boston] proceedings."[24]

## 2. *The 1974 decision of this court adjudging the FCC's 1973 order to be final*

In 1974 this court rejected the Commission's contention that "its 6 December [1973] order is *not a final decision* and therefore is not properly before the court at this time."[25] Instead, "[w]e [held] that the Commission's decision of 6 December constituted a final order for purposes of judicial review."[26] We had good reasons for so holding.[27]

First, we described the indicia of finality within the order and its historical context.

The *6 December order itself* purports to be a complete review of the Hearing Examiner's decision in favor of Fidelity.... The *finality* of that determination *is manifest* in the 6 December order. If the Commission intended merely an interim appraisal of the competing applications on the basis of the Los Angeles record, we are at a loss to decipher why the Commission undertook such a thorough review of each applicant's qualifications.

Moreover, an interim decision is not what was involved in the *two manda-*

---

**21.** *See id.* at 661 (citing *RKO General, Inc. v. Federal Communications Comm'n,* 670 F.2d 215, 222–25 (D.C.Cir.1981), *cert. denied,* 456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 442 (1982)).

**22.** *Id.* at 661 n. 4 (citation omitted).

**23.** *RKO General, Inc. (KHJ–TV),* 44 F.C.C.2d 123, 138 (1973) (emphasis added).

**24.** *Fidelity Television, Inc. v. Federal Communications Comm'n,* 515 F.2d 684, 703 n. 45 (D.C. Cir.) (emphasis added and citation omitted), *cert. denied,* 423 U.S. 926, 96 S.Ct. 271, 46 L.Ed.2d 253 (1975).

The Commission convened the Boston proceeding, to which Fidelity was made a party, to consider RKO's basic qualifications as broadcast licensee. *See RKO General, Inc. (KHJ–TV and WNAC–TV),* 31 F.C.C.2d 70, 75 (1971) (authorizing Fidelity to "participate in the hearing on the designated issues, insofar as such issues pertain to the qualifications of RKO General, Inc., to be a licensee of the Commission"); *id.* (promising to hold any decision favoring RKO over Fidelity

in Los Angeles in abeyance subject to "such action ... as appears to be necessary and appropriate in light of the evidence introduced in, and the outcome of, the Boston proceeding concerning the qualifications of RKO General, Inc. to be or continue to be a licensee of the Commission").

**25.** *Fidelity Television, Inc. v. Federal Communications Comm'n,* 502 F.2d 443, 447 (D.C.Cir. 1974) (per curiam).

**26.** *Id.* at 444.

**27.** The majority's lengthy discussion of the breadth of the condition attached to the Commission's 1973 order, and the scope of Fidelity's participation rights in the Boston proceeding, is beside the point. Absent any more probative evidence, a broad condition combined with a wide-ranging right to participate in a concurrent proceeding detracts from the likelihood that an order is final. But we need not look to such secondary evidence in this case. This court's 1974 decision is dispositive.

*mus proceedings.* The Commission was confronted by two decisions of this court wherein we unequivocally concluded that a *final order* in the Los Angeles proceeding *must issue,* but declined to so order the Commission on the basis of its representations that *a final decision was forthcoming.* The 6 December Commission order either expressed the Commission's purported effort to comply with this court's implied directives, or was a deliberate effort to deceive this court or evade its decision.

*Fidelity interpreted the 6 December order as final....* When it learned that the 6 December order had issued, it felt that the relief it sought—release of a final order—had been provided by the Commission, and accordingly requested the court to dismiss its renewed petition for writ of mandamus as moot. Had the Commission felt that the order was not a final determination, we fail to perceive why the Commission did not respond to this request....

Another aspect of the 6 December order which reveals its finality is its *disposition of RKO's petition to dismiss Fidelity's application for a license as moot.* If the 6 December order was not a final resolution of the Los Angeles proceeding, the Commission's rationale in dismissing RKO's petition escapes us, since such a *dismissal is logical only if a final decision* on the basis of that record *had been made.*[28]

Second, we pointed out that "[t]he impact of the 6 December order on Fidelity buttresses our conclusion" that the order is final and hence reviewable.[29] For "[e]ven if the order 'deeming' the denial of Fidelity's application is eventually reversed," RKO will continue to operate KHJ–TV in the meantime, "at least until the Boston proceeding is terminated." [30]

Third, we considered the effect of review on the administrative process in reaching our decision that the Commission's 1973 order was final. Although "[t]he 6 December order may not be the very last order issued by the Commission in the Los Angeles proceeding,"

[t]he order was promulgated at the highest level of the Commission after complete evaluation of the entire evidence produced in a proceeding which, as early as 1971, the Commission decided to isolate from the Boston proceeding. That the only applicants involved in the Los Angeles proceeding were RKO and Fidelity, whose comparative qualifications have now been resolved on the basis of the complete record compiled in that proceeding, is *persuasive of the order's finality.*[31]

In conclusion, we exclaimed that "it is clear beyond peradventure that the December order is a *final determination* of Fidelity's application on the basis of the record in the Los Angeles proceeding." [32]

3. *The propriety of deference to another panel of this circuit*

Our opinion in *Fidelity Television, Inc. v. Federal Communications Commission* was not intended to be mere language in which "the contending sides [could take]

---

**28.** 502 F.2d at 449–50 (emphasis added and omitted and footnotes omitted).

**29.** *Id.* at 450.

**30.** *Id.* The statutory authority for this practice is found at 47 U.S.C. § 307(c) (1982).

**31.** 502 F.2d at 451 (emphasis added).

**32.** *Id.* at 452 (emphasis added).
   The Commission made its 1973 order awarding channel nine to RKO over Fidelity conditional upon RKO successfully surviving the challenge to its basic qualifications to be a

broadcast licensee then being made in Boston. This form of defeasible grant resembles a conveyance of title, with a condition subsequent which could lead to divestiture—title is conveyed at the time despite the possibility that the contingency will materialize. The defeasible form of RKO's license is therefore perfectly consistent with my understanding—and the understanding of our panel in *Fidelity*—that the FCC's 1973 decision was a final order which terminated the proceedings relating to channel nine in Los Angeles.

... comfort." [33] That decision was—and until today I thought it remained—the authoritative decision of this court determining whether the Commission's 1973 order was final; if this court in 1974 decided no more than the majority now says we did, we were wrong to reach the merits of the Commission's 1973 order because it was not ripe for review. Remarks regarding finality in other opinions, which the majority properly disclaims reliance upon,[34] are gratuitous—dicta in the strictest sense of that term.

Even if the majority today would not have reached the same result a panel of this court reached in 1974, the earlier judgment of our colleagues should be respected and the legitimate expectation of consistency on the part of agencies and litigants should be fulfilled. As Professors Wright, Miller, and Cooper state in their discussion of the doctrine of law of the case,[35] deference is due even with regard to an "issue resolved implicitly despite the lack of any explicit statement." [36] The treatise writers point out that "[r]elationships within a court of appeals demand *greater deference* to earlier rulings, partly because they typically involve the concurrent judgment of two or more judges, and more importantly because they usually represent a deliberate decision reached in a case that is already well advanced and designed to control further proceedings." [37] It is ironic, given the majority's willingness to prostrate itself before an administrative agency, that it refuses to respect a prior judgment of this court.

B. *The Commission's 1973 Decision Should Be Construed to Be Final in Light of the Public Interest in Favor of Licensing the Most Qualified Broadcaster*

Even if a construction of the Commission's 1973 order as final were not compelled—and in this case it is—the logic underlying the Commission's cutoff rule, the theory behind limited-period licensing, and the rapid changes evident in the applicants for channel nine and the community they would serve require that this proceeding be reopened.

1. *The purpose of the cutoff rule.*

To discharge its responsibility to regulate open-air broadcasting in the "public interest," the Commission must balance competing considerations. On the one hand, "[t]here is the palpable public interest in assuring that the limited remaining broadcast facilities go to the best qualified applicant"; on the other hand, "[t]here is also an interest in procedures and administrative techniques that enable the Commission to handle its work load efficiently, and with optimum use of limited administrative resources." [38] The cutoff rule fulfills the latter function. It is based on the theory that some expedition in achieving finality in

---

**33.** Maj.Op. at 660.

**34.** *See id.* at 660–661.

**35.** Law of the case doctrine is not technically applicable under my view of these proceedings: If the proceeding that began in 1965 was terminated by the Commission's 1973 order and by the 1975 affirmance by this court, then this court's decision holding the Commission's order to be "final" and ripe for appeal was rendered in a different proceeding from the current one. But the majority is caught in a dilemma, for if the 1965 proceeding was *not* terminated in 1973—which is the upshot of the majority's holding today—then this court's earlier decision holding the Commission's 1973 order to be final *is* the law of the case and should therefore be followed by the majority. Thus, whichever view one takes of events in this case, City of Angels's motion to intervene should be granted: If the 1965 proceeding terminated in 1975, then perforce the current proceeding is a new proceeding open to all, including City of Angeles; if the current proceeding is merely a continuation of the 1965 proceeding, the 1974 decision of this court holding the Commission's order to be final is the law of the case, the proceeding thus terminated upon this court's affirmance in 1975, and the same result is reached.

**36.** 18 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4478, at 789 (1981) (footnote omitted).

**37.** *Id.* at 795–96 (emphasis added).

**38.** *Radio Athens, Inc. (WATH) v. Federal Communications Comm'n,* 401 F.2d 398, 401 (D.C. Cir.1968).

the award of broadcast licenses is in the public interest. The rule works well in ordinary comparative hearings, but this case is extraordinary—the proceeding has dragged on for nearly twenty years.[39] In this case, cutting off new applicants for channel nine insulates both RKO and Fidelity from competition "at precisely the time when the public interest might favor the spur of competition or an alternative licensee."[40]

This desire to promote competition is reflected in the decision of this circuit in *New South Media Corporation v. Federal Communications Commission.*[41] In that case we held that the Commission could not delay acceptance of competing applications when lengthy hearings had to be held concerning a broadcast licensee's (RKO's) basic qualifications.[42] Although City of Angels appears here as an intervenor, the purpose of its intervention is to require the Commission to open a new proceeding. In the new proceeding City of Angels, along with various other applicants, would have the opportunity to compete for the license to operate on channel nine. Based on past experience in the California broadcasting market, the Commission estimates that "[o]ne could therefore reasonably anticipate a sizeable number of applicants for the Los Angeles VHF channel."[43]

### 2. *The logic behind limited-period licensing*

The communications act limits the duration of broadcast licenses to five years and calls for comparative hearings with new entrants at that time.[44] The licensing process assumes that the public benefits from periodic reexamination of the qualifications of incumbent licenseholders and consideration of any challengers who desire to enter the field. After more than *nineteen* years, the principle of limited-period licensing demands that the ranks be opened up to new challengers, just as they are in the ordinary situation after *five* years. The Commission cannot square its action here keeping the ranks closed to but two challenges after nineteen years—both discredited in several ways—with the fundamental policy of the act it is administering.

### 3. *Changes in the license applicants and the community they would serve*

Because Fidelity, RKO, and the greater Los Angeles metropolitan area they seek to serve have experienced dramatic changes since RKO and Fidelity filed mutually exclusive applications in 1965, the Commission should be required to convene a new proceeding to consider the intervening events and the ability of new challengers to meet the needs of the dynamic Los Angeles community.

The record in this case was first compiled in *1965.* Fidelity's management and investors have changed significantly in the past nineteen years. Almost seventy percent of Fidelity's stock changed hands between

---

39. A general procedural rule should not be applied in such as a way as to undermine the purposes it was designed to serve. *Cf. WAIT Radio v. Federal Communications Comm'n,* 418 F.2d 1153, 1157 (D.C.Cir.1969) ("[A] general rule, deemed valid because its overall objectives are in the public interest, may not be in the 'public interest' if extended to an applicant who proposes a new service that will not undermine the policy, served by the rule, that has been adjudged in the public interest."), *cert. denied,* 409 U.S. 1027, 93 S.Ct. 461, 34 L.Ed.2d 321 (1972).

40. *Carlisle Broadcasting Assoc.,* 59 F.C.C.2d 885, 889 (1976) (deferment of license renewal application).

41. 685 F.2d 708 (D.C.Cir.1982).

42. *See id.* at 715.

The majority's attempted distinction—that the court in *New South Media* called for comparative hearings while a comparative hearing already exists in this case—is sterile. A stale record documenting the "qualifications" of two mediocre contenders does not adequately fulfill the objectives of the comparative hearing. Fresh applicants are needed after nineteen years to satisfy the concern for competition at the heart of *New South Media.*

43. Brief for Federal Communications Commission at 23 n. 25.

44. *See* 47 U.S.C. §§ 307(c), 309(e) (1982).

1965 and 1983, and the number of shareholders has increased over seven times.[45] In addition, a program coordinator and long-time stockholder of Fidelity has twice pled guilty to criminal charges involving fraud and grand theft.[46]

The status of RKO may also be different from what it was nineteen years ago. On the current record, we cannot know whether this is true or not because the requisite factual inquiry has not been made. But that is precisely the point—until the Commission holds a new evidentiary proceeding we will not know whether RKO has changed in the nineteen years since it filed an application to renew its license to channel nine.

Inquiry into the transformed needs of the Los Angeles service area is perhaps of greatest importance to reaching an intelligent licensing decision—it is also the most glaring deficiency in the current record. Los Angeles is currently experiencing such a great influx of immigrants that some have likened it to an invasion.[47] The changes are so dramatic that Los Angeles appeared on the cover of *Time* magazine just last summer.[48] The many transformations include a rapid increase in population (more than two million additional foreign immigrants since 1970)[49] and changes in ethnic composition[50] of the sort that would impact on selection of a broadcaster to serve the Los Angeles area.[51]

Language in many decisions of this court evince an unwillingness to allow agencies to make decisions based on outdated and therefore unreliable factual records.[52] The majority's observation that these cases "involved some circumstance, generally the

45. *See* Reply Brief of Appellant at 5.

46. *See id.* at 7.

47. *See The New Ellis Island,* Time, 13 June 1983, at 18, 18.

48. *See id.*

49. *See id.* ("[D]uring 1982, according to Rand estimates, more than 90,000 foreign immigrants settled there, and since 1970, more than 2 million.").

50. *See id.* at 19 ("The statistical evidence of the immigrant tide is stark. In 1960 one in nine Los Angeles County residents was Hispanic, and a scant one in 100 was Asian. Today one in ten is Asian. Nearly a third of the county is now Hispanic, as are almost two-thirds of L.A. kindergartners. Nor is this ethnic sweep a limited, inner-city affair. Although whites have been a minority in the hemmed-in city of Los Angeles for some time (in 1980, 48% of a population of 3 million), the Anglos are now, suddenly, also shy of a majority throughout the whole county (3.8 million out of 7.9 million). Today, *everyone* in L.A. is a member of a minority group.").

51. *See id.* at 19–20 (reporting that many members of various ethnic groups watch their own television stations, do not cross ethnic lines, and retain a foreign tongue as their primary language).

52. *See WORZ, Inc. v. Federal Communications Comm'n,* 345 F.2d 85, 86 (D.C.Cir.1965) (per curiam) ("[T]his case has been beset throughout by a variety of dubious circumstances which, at the best, have prolonged the ultimate choice an unconscionably long period beyond the assembling of the facts upon which that choice must of necessity be based ... We are not prepared to say ... that the guardianship of the public interest, entrusted by Congress to the Commission, is adequately effectuated by confining the choice to these two applicants in the light of facts put on the record over ten years ago. We think this proceeding should be reopened, with an adequate opportunity provided for the receipt of new applications from persons who have not hitherto appeared herein."), *cert. denied,* 382 U.S. 893, 86 S.Ct. 180, 15 L.Ed.2d 150 (1965); *Fort Harrison Telecasting Corp. v. Federal Communications Comm'n,* 324 F.2d 379, 387 (D.C.Cir.1963) (" '[I]t would not be appropriate for the Commission to determine in 1961 on the basis of a *somewhat supplemented* 1957 record where and to whom VHF Channel 2 ought to be assigned.' ... We reiterate that under our 1961 order the license of Channel 2 in Terre Haute is to be determined on the basis of the comparative qualifications of applicants as of the present time, rather than on a record made in 1959...." (emphasis added and omitted and citation omitted)), *cert. denied,* 376 U.S. 915, 84 S.Ct. 665, 11 L.Ed.2d 611 (1964); *WORZ, Inc. v. Federal Communications Comm'n,* 323 F.2d 618, 620–21 (D.C.Cir.1963) (per curiam) (denying petition for rehearing en banc), *cert. denied,* 376 U.S. 914, 84 S.Ct. 664, 11 L.Ed.2d 611 (1964); *Sangamon Valley Television Corp. v. United States,* 294 F.2d 742, 743 (D.C.Cir.1961) ("[I]t would not be appropriate for the Commission to determine in 1961 on the basis of a *somewhat supplemented* 1957 record where and to whom VHF Channel 2 ought to be assigned." (emphasis added)).

presence of *ex parte* contacts, that cast doubt upon the integrity of the Commission's proceedings," [53] is at best a partial response. To begin with, there remains the language expressing concern over the staleness of the agency's record; the majority has no basis for intimating that something akin to ex parte contacts *must* infect the record before a new evidentiary proceeding becomes mandatory.[54] More fundamentally, ex parte contacts and antiquated data are objectionable for the same reason: they render unreliable the data on which the Commission must rely to reach an informed decision. In both cases the remedy is also the same: the unreliable information must be purged and new evidence gathered. That is just the task the Commission should undertake in this case.

To obviate the need for an entirely new proceeding, the majority puts great store in 47 C.F.R. § 1.65 (1983), which requires applicants to inform the Commission of "[s]ubstantial and significant changes in information furnished by them to the Commission. The majority's reliance is mis-

placed. Fidelity's disdain for section 1.65, as reflected in the proceeding below, "raises very serious questions" [55]—not the least of which is the extent to which the majority can trust Fidelity to update the record on remand. Nor can RKO be trusted to supply critical information concerning its activities. It has confessed to withholding material financial information from the Commission in the past. Considering the prior record of the information-providers on which the majority would rely, why risk the possibility that the Commission will be unable to compile a record sufficiently fresh to withstand a staleness attack and the inevitable delay attendant upon such a challenge? The passage of nearly twenty years suggests the need for a new proceeding to create a new record and to entertain applications from whatever new contenders demand to be heard.

## III. THE SPECTRE OF UNENDING DELAY

The FCC's complaint is that granting City of Angels's motion to intervene, and

---

**53.** Maj.Op. at 665 n. 12.

**54.** The majority cites *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 294–96, 95 S.Ct. 438, 446–47, 42 L.Ed.2d 447 (1974), for the proposition that "a court shall rarely be justified in overturning an administrative decision on staleness grounds." Maj.Op. at 666 n. 12. But the Court's ratio decidendi was comprised of narrower grounds. The Court was concerned that if parties to administrative proceedings were able repeatedly to reopen the record on the eve of an agency's decision, "there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening." 419 U.S. at 295, 95 S.Ct. at 446 (quoting *Interstate Commerce Comm'n v. Jersey City,* 322 U.S. 503, 514, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420 (1944)). The majority does not suggest that the FCC requires twenty years to process a license renewal.

Moreover, the cases cited by *Bowman* (and *Bowman* itself) refused to reopen proceedings on grounds of "staleness" when the lapse between evidentiary hearing and decision varied between one and five years. *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. at 294, 95 S.Ct. at 446 (five years); *St. Joseph Stock Yards Co. v. United States,* 298 U.S. 38, 47, 56 S.Ct. 720, 723, 80 L.Ed. 1033 (1936)

(one year). The delay in this case is between four and ten times greater than the delay the Court confronted and the changes more dramatic. The remaining cases went off on grounds other than staleness. *See United States v. Interstate Commerce Comm'n,* 396 U.S. 491, 524, 90 S.Ct. 708, 724, 24 L.Ed.2d 700 (1970) (Interstate Commerce Commission need not take further evidence on merger impact when harm feared did not materialize); *Illinois Commerce Comm'n v. United States,* 292 U.S. 474, 481, 54 S.Ct. 783, 785, 78 L.Ed. 1371 (1934) (question of fact for the Interstate Commerce Commission); *United States v. Northern Pacific Ry. Co.,* 288 U.S. 490, 494, 53 S.Ct. 406, 407, 77 L.Ed. 914 (1933) (estoppel).

**55.** *RKO General, Inc. (KHJ–TV),* 44 F.C.C.2d 123, 127 (1973); *see Fidelity Television, Inc. v. Federal Communications Comm'n,* 515 F.2d 684, 705 n. 1 (D.C.Cir.) (per curiam) (denying petition for rehearing en banc) ("[T]he Commission stated that there was a 'repeated failure to make timely and necessary reports of new developments affecting a proposal. It noted that 'this practice continued even after its [Fidelity's] attention was directed to the need to keep its house in order.' "), *cert. denied,* 423 U.S. 926, 96 S.Ct. 271, 46 L.Ed.2d 253 (1975); *RKO General, Inc. (KHJ–TV),* 44 F.C.C.2d at 135–36; *cf. RKO General, Inc. (KHJ–TV),* 54 Rad.Reg.2d (P & F) 53, 60 & n. 40 (1983).

thereby opening up the proceeding to new applicants, will disrupt an otherwise orderly process, delay necessary hearings, and vest RKO with several more years of lucrative ownership of station KHJ.[56] The majority harbors the same fear, asserting that "the inevitable result of opening this proceeding to all comers would be yet further delay in determining who should be the licensee of Channel 9 in Los Angeles." [57]

Unfortunately, the delay feared by the Commission and the majority will occur whether new applicants are permitted to apply for this license or not. In the first place, on remand the Commission must (1) examine RKO's fitness to continue as licensee of channel nine (2) examine Fidelity's basic qualifications, and (3) compare the qualifications of the two prospective licensees. After that arduous task is complete, the Commission—in order to comply with the dictates of the majority—must engage in a wide-ranging expedition to gather information to update the twenty-year-old record.

These monumental tasks could take years. In recognition of this fact, the Commission has already entered a two-phase scheduling order [58] under which the second, comparative, phase may not even begin until sometime in 1985. Thus, it is clear that this proceeding will not be over soon, regardless of how we resolve this appeal. In comparison to the resources necessarily committed to resolving the contest between Fidelity and RKO, the additional time consumed by opening up the proceeding to new challengers would probably not be significant. Moreover, the competition of possibly superior candidates for broadcast licenses is worth the small incremental investment that would be occasioned by entertaining their applications.

Ultimately, the total time this license proceeding takes is up to the FCC. If the FCC is determined to act with dispatch, it will do so. More likely, given the FCC's past inability to resolve the issues in this case in a timely fashion (nearly prompting a writ of mandamus by this court to force the Commission to issue an opinion), this case will linger on for another two decades, whether additional applicants for this channel are allowed in or not.

## IV. CONCLUSION

Because the majority affirms a Commission order denying a motion to intervene in a case which I thought this court had terminated nearly ten years ago, and because its holding today will deprive the citizens of Los Angeles of the benefits of genuine competition in television broadcasting for untold years to come, I respectfully dissent.

---

**56.** *See* Brief for Federal Communications Commission at 27–28.

**57.** Maj.Op. at 667.

**58.** *See RKO General, Inc. (KHJ–TV)*, FCC 84–26, 34251, Nos. 16679, 16680 (25 Jan. 1984); *RKO* *General, Inc. (KHJ–TV)*, FCC 84M–989, Nos. 16679, 16680 (27 Feb. 1984). The applicants have filed various motions to enlarge the issues in the proceeding which could delay a final disposition of the license to channel nine for many more years to come.